This is an action for damages for physical injuries alleged to have been sustained by plaintiff as the result of a collision between a motor bus, on which plaintiff was a passenger, and a United States army truck. The defendants are the Homer-Doyline Bus Line, a commercial partnership; the individual members of said partnership, namely James McCalman, H.C. McCalman and Herbert Reeder; the Travelers Insurance Company, public liability insurer of the bus company, and C.C. Lowe, driver of the bus.
The accident happened about 7:00 P.M. on December 10, 1942, at a point about two and one-half miles west of Minden on U.S. Highway 80. The evening was dark, cloudy and a misting rain was falling at the time. Just after the forty-passenger bus crossed Dorcheat Bayou and entered a slight right-hand, up-hill curve in the highway, a United States army truck appeared in sight, proceeding in a direction opposite to that of the bus. The truck was travelling at a high rate of speed, straddling the center line of the highway, and collided with the bus which was being driven at a speed of some 15 miles per hour, more or less, the point of impact of the collision being at or about the second seat behind the driver on the left side of the bus, which seat at the time was occupied by plaintiff, a paying passenger on the bus.
As a result of serious and disabling injuries to his left leg, suffered in the accident, plaintiff brought suit for the recovery of damages totaling $40,000 against all defendants, in solido.
[1] The gross negligence of the driver of the Army truck is definitely and incontrovertibly established, but, in view of the fact that the said truck was the property of and was being operated by the government of the United States, protected from suit in a tort action by virtue of sovereignty, the defendants in this suit must of necessity bear the full brunt of the action against them as joint tort feasors.
The sole question in this case involves the finding of facts bearing upon the existence of any fault or act of negligence on the part of the driver of the bus.
After trial in the district Court, there was judgment in favor of plaintiff awarding damages in the total amount of $15, 308.46, from which judgment defendants appeal.
The first question, with reference to the degree of care required to be exercised by the driver of the motor bus, is whether the bus upon which plaintiff was a passenger at the time of the accident was being operated as a public or private carrier.
[2] In considering this particular point the learned Judge of the lower Court set forth the facts plainly established by the evidence in the record, which facts led him to the finding that the bus line was operated as a common carrier. In this finding we unreservedly concur.
The business known as the Homer-Doyline Bus Line operates between Homer and Haynesville in Claiborne Parish, Louisiana, and the Louisiana Ordnance Plant of Silas Mason Company between Minden and Doyline *Page 350 
in Webster Parish. The line maintains a bus station in Homer, operates eleven busses having varying passenger carrying capacities, the particular bus involved in this case being a forty-passenger vehicle, solicits the business of carrying passengers from Homer and Haynesville to the Ordnance Plant and return, sells tickets to such passengers at scheduled fares, and operates under a certificate of convenience and necessity from the Louisiana Public Service Commission. While the general policy of the company tended to restrict its passenger traffic to employees of the Louisiana Ordnance Plant, there is testimony in the record establishing the fact that, at times, a number of passengers, who were not employees at the plant, were transported to and from points on the route, and this testimony was corroborated by one of the partners operating the bus line, a defendant and witness in this case.
[3] The definition of a common carrier as being one which "undertakes to carry for all people indifferently," as stated by the court in Higginbotham v. Public Belt Railroad Commission, La. App., 181 So. 65, 69, would not exclude the Homer-Doyline Bus Line from classification as a common carrier. While it is true that this particular bus line did not actively solicit nor cater to general passenger traffic along its route, it did not exclude such traffic. The business was organized and operated for profit, and its mode of operation is more comparable to that of express or limited steam or motor vehicle service than any other.
It is argued on behalf of defendants that bus lines operated under contract for the benefit of a particular class, and not for the benefit of the public generally, have been held to fall outside the classification of a common carrier. We do not perceive the analogy of this argument to the facts of the present case. There was no contract between the operators of the bus line and either the Silas Mason Company or its employees. The operation of this bus line was not accessory to the operation of the ordnance plant and was not established nor subsidized by the operators of the plant for the convenience of their employees. Nor was the line established or operated by the employees in the interest of their mutual convenience. The fact that the transportation of employees to and from the ordnance plant was the motivating reason for the establishment of the line is not such a restricted use in contemplation of law as would relegate the business to the status of a private carrier.
If there were any question in our minds as to the character of the defendant bus line in this case, we feel that it would be definitely settled by the provisions of Act No. 301 of 1938, providing for the "supervision, regulation and control by the Louisiana Public Service Commission of for hire motor carrier transportation, including common and contract carriers of persons and property * * *", which specifically defines a "common carrier by motor vehicle" and carefully distinguishes such a classification from "contract carriers". Paragraphs (j) and (k) of Section 2 of the Act declare:
"(j) The term 'Common Carrier by Motor Vehicle' shall be held deemed and construed to mean any person, the essential nature of whose business or operations comprises engaging in, soliciting or accepting persons or property for transportation for hire, charge or compensation as an employment or holding himself out as so available to the public generally and indiscriminately for such operations, whether or not such business or operations be conducted over a regular route, between fixed termini, within a defined area, or upon a regular or irregular schedule, except where such business is conducted exclusively within the corporate limits of an incorporated municipality and/or within a radius of seven (7) miles of the limits of an incorporated city, town or village; provided that any person who shall, with or without specific contracts, furnish such transportation to more than five (5) separate shippers of property or more than five (5) passengers shall be, prima facie, held and deemed to be a common carrier and the burden shall rest upon him to show by a clear preponderance and to the satisfaction of the Commission that the character of his operations is not that of a common carrier."
"(k) The term 'Contract Carrier by Motor Vehicle' means any person not included under paragraph 'j' of this Section, who or which under special and individual contracts or agreements, and whether directly or by lease or by any other arrangement, transports passengers or property by motor vehicle for compensation or hire, where in the course of such transportation a highway between two or more incorporated cities, towns or villages is traversed." *Page 351 
It is to be observed that under the plain provisions of paragraph (j) quoted above, the defendant bus line, since it furnished transportation to more than five passengers, would bear the burden of overcoming this prima facie classification as a common carrier and proving that its operations were not that of a common carrier. In order to sustain this burden it would be necessary to show that the carrier was a contract carrier, and the definition of the term "contract", as used in the Act, is set forth in paragraph (l) of said Section 2, as follows:
"The word 'Contract' as used in Section 2 of this Act shall be held, deemed and construed to mean any arrangement, agreement or understanding whatsoever covering or contemplating the transportation of persons or property for hire * * *."
Defendants have not shown any "arrangement, agreement or understanding", but have only established the fact their bus was largely devoted to transporting employees of the ordnance plant. The record shows that the bus schedule was coordinated with changes in shifts at the plant. The driver of the particular bus involved in this case was himself an employee of the Silas Mason Company, and as compensation for driving the bus was given free transportation and a small weekly wage in cash. As we have said, there is no evidence of any character of agreement or arrangement which would bring the defendant bus line under the definition of a contract carrier as fixed in the Act. Having failed to establish its status as a contract carrier, it is obvious that the bus must fall under statutory classification of a common carrier by motor vehicle, and this classification, quite apart from the provisions of the Act, in our opinion, is definitely established by the character of the enterprise itself.
We further believe that the admissions made by defendants' pleadings in themselves are controlling as classifying the business as that of a common carrier. In his petition plaintiff made the following allegations pertinent to this point:
"6. That on the 10th day of December, 1942, and prior thereto, the Homer-Doyline Bus Line, with James McCalman, H.C. McCalman, and Herbert Reeder, as its owners and in active charge thereof, operated a bus line for passengers for hire between Homer, Louisiana and the Louisiana Ordinance Plant near Minden, Louisiana and Doyline, Louisiana, in Webster Parish, which plant is operated by Silas Mason Company."
"7. That in said operations on December 10, 1942, said Homer-Doyline Bus Line, James McCalman, H.C. McCalman, and Herbert Reeder used a bus and charged fares for riding thereon."
"10. That on said date of December 10, 1942, petitioner was riding as a passenger, having paid the fare to ride as such, on said bus, having boarded said bus at Homer, Louisiana, to go to the Louisiana Ordnance Plant in Webster Parish, Louisiana."
The allegations set forth in the preceding articles were admitted in defendants' answer.
In our opinion there remains no doubt as to the conclusion that the Homer-Doyline Bus Line was a common carrier, and, accordingly, that the question of negligence in the operation of its motor busses should be measured by the standards required of common carriers.
[4] The rule is well established in this State that a common carrier of passengers by motor busses is required to exercise the highest degree of care. Hughes v. Baton Rouge Electric Co., La. App., 188 So. 473; Oppenheim v. Toye Bros. Yellow Cab Co., La. App., 7 So.2d 420.
[5] Under this rule of "highest degree of care" the commission of any act of negligence which contributes to accidental injury to a passenger, or the omission of any act of prudence, care or caution which might have resulted in avoiding the infliction of injury upon a passenger, subjects the carrier to liability in damages.
We proceed now to a discussion of the evidence in the record bearing upon the determination of this point.
The curve in the highway, which was the situs of the accident, is very slight, and the grade of the hill is moderate. There was no obstruction to the view of the bus driver, who was proceeding on the inside of the curve, and, according to his own testimony, he saw the Army truck approximately 200 yards distant, and observed the truck to be in the middle of the highway about halfway over the center line, in other words, practically straddling the center line marking the two lanes of the highway. At the point on the curve where the collision took place, it was established that *Page 352 
the paved portion of the highway was 20 feet 2 inches in width, and the north shoulder of the highway to the right of the bus' westward course, was some 8 feet in width and in good condition. The overall width of the bus involved in the accident was 8 feet, and the overall length was 27 feet 6 inches. The driver of the bus testified that at the time he first saw the truck come into view some 200 yards away, the bus was moving at a speed of 15 to 20 miles per hour with its left wheels approximately 2 feet inside, that is, north of the center line, therefore, on its own side of the highway; that the oncoming truck continued for a brief space in the center of the highway, then turned to the south side, then back to the center, again to the south side as far as the shoulder of the road, from which point it suddenly swerved directly across the road and into his bus; that he had begun to turn toward the right-hand shoulder of the road, and, in fact, at the time of the impact, had changed his course to such extent that the right wheels of his bus were on the shoulder; that, despite the swerving course of the truck, he did not decrease the speed of his bus nor apply his brakes, but that he brought the bus to an almost immediate stop following the impact. This witness, one of the defendants, also testified that the bus had travelled only about 10 feet from the point where its right wheels had reached the shoulder of the road when the collision occurred. This testimony as to his actions is somewhat at variance with other portions of his testimony. During his examination, in answer to a question of counsel, the witness testified:
"I kept coming up the hill expecting him to get back on his side which he did and cut back and back again, it never one time occurred to me that he was going to hit us until he had already crashed into the side."
If this statement is true, and if this witness, observing the course of an approaching vehicle moving at high speed, swerving from side to side on a wet highway at night, did not anticipate the very immediate danger of a collision, it can only be concluded that he was lacking in that reasonable foresight and judgment which is required of drivers of private vehicles, and which is required in a much higher degree by drivers of common carriers.
It is worthy of comment that the erratic course of approach of the oncoming Army truck was apparent not alone to the driver but to two of the passengers in the bus, who testified as witnesses for the defendant. One of these passengers, Farrow by name, particularly testified that almost immediately upon seeing the truck come into view he called out to the driver of the bus "Yonder comes something running away", or words to that effect. We feel that this testimony is of particular importance as evidencing the dangerous potentialities of the situation pregnant with not merely a possibility but the very immediate probability of accident. Despite this fact, the bus driver, according to his own testimony, apparently failed to recognize the danger and continued on his course near the center of the highway until almost the last second of time which remained for any action, in which he did turn his vehicle toward the shoulder of the road, and possibly reached the shoulder, at least partially, just at the time of the collision.
There is a conflict of testimony as to whether only the right front wheel of the bus actually left the pavement and traversed the shoulder for a few feet, or whether both right wheels of the bus reached the shoulder. To our minds, it is not of particular importance whether one wheel or both wheels of the bus were upon the shoulder of the road at the time of the impact, but, it is most important that the driver of the bus had not by any means exercised that high degree of care, much less the highest degree of care, in response to which he was obligated to move his bus as far as might be possible, under the existing circumstances of road conditions and space, out of the path of the approaching vehicle, which gave every indication of being either out of control or driven so recklessly as to present an immediate danger to the safety of the passengers in his vehicle.
There is some testimony in the record as to the presence immediately in the vicinity of the center line of the highway, and, for a space of some two feet on each side thereof, of a considerable amount of shattered glass. It is urged by counsel for plaintiff that this circumstance indicates that the impact took place before the bus changed course. Counsel for defendants argue that the glass could not have consisted *Page 353 
of particles from the shattered bus windows, since there is the testimony of witnesses to the effect that the inside of the bus was "covered" with glass. In view of the conclusion which we have reached in this case, as hereinafter set forth, we do not think this point is of any great import, particularly since the record is devoid of any direct testimony as to whether the glass on the highway was from the bus or the truck, and any conclusions reached therefore would be the result of speculation and conjecture, which, no matter scientific, would be extremely uncertain.
Three distinct and irreconcilable theories as to the manner of the actual occurrence of the accident have been proposed in the instant case. Briefly stated, these theories are:
First, the theory of plaintiff that the bus continued holding to its straight course along the north side of the highway with its left wheels within two feet of the center line, and in this position was sideswiped by the Army truck, being driven at high speed in a careless, reckless and grossly negligent manner. Plaintiff concludes from this theory that the driver of the, bus was guilty of contributory negligence in failing to move his vehicle as far as possible to his right, thereby avoiding the swerving, side-swiping impact of the truck.
Second, the theory of the defendants that the bus driver had actually turned his bus in sufficient time to reach the shoulder of the road, and, almost at the exact moment when he had straightened the course of the bus with both right wheels on the shoulder of the road, the vehicle was struck at a 45 degree angle by the Army truck, which had travelled from a position on the opposite or south shoulder of the highway and rammed headfirst into the bus, thence it caromed from the side of the bus and continued down the road for a distance of more than a hundred yards, where it was finally brought to a stop on the left side of the highway. Upon the basis of this theory it is argued that the defendant bus driver had actually taken every possible precaution to avoid an accident, thereby exonerating himself of any charge of either active neglect or passive failure to avail himself of every opportunity in attempting to avoid an accident:
Third, the theory advanced by the learned Judge of the district Court, who arrived at the conclusion that the bus, immediately preceding the collision, was itself partially on the wrong or left side of the highway; that the driver, in the last second of time, turned sharply to the right in the forlorn hope of reaching safety on the shoulder of the road, and was struck by the Army truck which had proceeded in an undeviating course along the center of the highway. From this theory the district Judge reached the conclusion that the bus driver had been actively guilty of contributory negligence in entering the slight curve with his vehicle partially on the wrong side of the highway, had too late made the effort to gain a place of safety on the right side, and by this maneuver had angled his bus across the highway in such manner as to almost completely block the paved portion thereof.
At first glance the task of constructing a fourth and differing theory would seem fraught with difficulty, but we have managed, with surprising ease, to overcome this difficulty, and have predicated our judgment upon a set of facts which incorporate a portion, at least, of each of the three theories above noted.
Piecing together the undisputed facts disclosed by the record, and adding those which we believe to have been established by the most reliable and credible testimony and substantiated by the physical facts surrounding the occurrence of the accident, the true explanation stands out distinctly in our minds. We hold these facts as established; that the speed of the bus at the time of the accident was 15 miles per hour, a variation of five miles per hour either way being insufficient to affect the importance of this factor in relation to other facts; that the speed of the Army truck was approximately 50 miles per hour; that the driver of the bus, according to his own testimony, perceived the approaching truck at a distance of approximately 200 yards, and observed its position as being astride the center line of the highway; that the bus driver relied upon the assumption that the driver of the truck would resume a position on his proper side of the highway, thereby permitting the two vehicles to pass in safety; that he rested in serene reliance upon this conclusion, despite the obviously erratic maneuvers of the truck in swerving twice to the far side of the highway, then back to or across the center line; that he perceived only too late the immediate danger and tried to *Page 354 
avert the collision by swerving the course of the bus toward the right shoulder of the road at an angle of approximately 45 degrees, and, in fact, reached the shoulder with the right wheel of his bus at approximately the same instant of time that the truck, having regained the center of the highway in a mad dash from the opposite shoulder of the road, crashed into the bus at a sharp angle, the left front portion of the truck striking about the point where plaintiff was sitting in the second seat behind the driver of the bus; that the truck then "swiped" along the side of the bus, out of control, for a distance of 100 yards or more, until it was brought to a stop on the left or north side of the highway; that the driver of the bus straightened his vehicle, bringing the right rear wheel off the highway onto the shoulder, tracking the right front wheel, and stopped within the course of a few feet.
Aided by the skillful questioning of his counsel, an attempt was made by the defendant, Lowe, to qualify his testimony to such extent as would leave the impression that all the zig-zagging maneuvers of the truck occurred within the last 100 yards between the meeting vehicles. We cannot accord full credit to this line of testimony. In itself we cannot conceive that there would be anything unusual in the appearance of a vehicle travelling at a speed of 50 miles per hour, which is not a terrifically high rate, even though the vehicle was partially across the center line of the highway. Yet there was something so marked about the course and the appearance of the truck when it first came into view 200 yards away that one of the passengers in the bus immediately cried "There comes something running wild".
Lowe's testimony as to the last second development of the zig-zagging course of the truck appears to us to have been clearly the result of afterthought, and is directly in conflict with his statement that the possibility of a collision did not even occur to him until it had actually taken place. Likewise, it is impossible to reconcile this feeling of safety which apparently lulled the bus driver into a false sense of security with his testimony that he turned the course of his bus as soon as he recognized the danger when the truck was still 100 yards distant.
Diligent effort is made by distinguished counsel for the defendants to show the development of a sudden emergency and the consequent impossibility of maneuvering the unwieldy bus in the course of 3 1/2 seconds, which counsel claims was the only period of time in which the bus driver could possibly have acted after the first indication of an emergent danger. Careful study and consideration of all facts will not sustain counsel's argument. We concede the truth of his metaphorical assertion that a bus cannot be handled like a rapier, but counsel goes too far when he attempts to prove that a bus 27 1/2 feet long and 8 feet wide could not have been moved a distance of 8 feet, measured perpendicularly to its course, within the space of 3 1/2 seconds. And the facts show that it would have been necessary for the driver of the bus to change his course only to such an extent as to move the center of the bus 8 feet to its right where the bus would have then been in a position entirely on the shoulder of the road. The testimony shows that the left wheels of the bus were approximately 2 feet inside or north of the center line of the paved highway, and the bus having an overall width of 8 feet, this would place the center of the bus approximately 6 feet north of the center line. It was only necessary then for the driver of the bus to move the center of the vehicle 4 feet north, that is, to his right, to bring it over the edge of the pavement, and an additional 4 feet still further north to bring it over the exact center of the 8 foot shoulder, which the testimony shows was available at this point. A turn to the right at a reasonable angle, immediately upon perceiving a danger from a vehicle 100 yards away, would have brought the bus completely over on the shoulder of the road and enabled its course to be straightened on said shoulder easily within an actual travelling distance of 58.7 feet, which, by counsel's own calculation, was available for the maneuver within the space of time allowed and on the basis of his own computation of speeds. We call attention to the fact that counsel, in his development of this point, and in a spirit properly becoming to an advocate, gave his clients the benefit of every doubt, and, instead of estimating the speed of the bus at a flat 15 miles per hour, which was the speed established by the preponderance of the testimony, he computed the speed at 15 miles per hour for only one second, and at 10 miles per hour for two and one-half seconds. *Page 355 
We are firmly convinced that the driver of the bus had more than sufficient warning of impending danger to embark upon and carry out a maneuver which would have brought his vehicle out of the danger zone unscathed by any collision. This would be true even if the appearance of danger had only developed when the two vehicles were separated by a distance of 100 yards. But, we are convinced by the facts established, as was the district Judge, that the appearance of danger was evident from the very moment the truck was observed at a distance of 200 yards from the bus, and its driver therefore had almost 7 seconds rather than 3 1/2 in which to take action to avoid a collision.
[6] We particularly point out that the facts in this case did not establish the existence of a situation which confronted the bus driver with the necessity for a choice of actions, nor was the time of such short duration as to permit only a reflex response to a suddenly developing emergency. On the contrary, there was only one reasonable course of action indicated by ordinary care, caution and judgment, which course was for the driver of the bus, immediately upon perceiving the approach of a potentially dangerous instrumentality in the nature of an obviously recklessly driven vehicle, to direct the bus as far as possible out of the path of the danger. In this duty the bus driver failed and his failure was negligence, measured by even ordinary standards of care and caution required of the driver of motor vehicles, and certainly negligence of a much higher degree when measured by the rule required on the part of the driver of a common carrier.
We think both the facts found and the principles enunciated by this Court in the case of Manley v. Hammons, 20 So.2d 817, 820, are applicable to the instant case. In the Manley case we held that a person perceiving the approach of a car from an opposite direction, on the wrong side of the road, at a distance of 300 feet, on a gravelled highway only 22 feet in width and with a shoulder some 2 to 3 feet wide, leading to a shallow ditch, was not confronted with a sudden emergency. We further declared:
"The simple fact that the driver of one of two meeting automobiles, whose combined speed approximate 60 miles per hour, has not cleared the road within a space of 300 feet, in our opinion, should be, in itself, sufficient indication to the driver of the other vehicle that there is immediate danger of a collision. Such a situation imposes upon the blameless driver the necessity of taking every possible precaution which would serve to avoid and prevent such a collision. Drivers of motor vehicles are operators of potentially dangerous instrumentalities and cannot be permitted to substitute assumption for reason, caution and prudent action."
The case of Ross et al. v. Bay City Transit Co. et al.,12 Cal.App.2d 639, 56 P.2d 247, 248, presents facts startlingly similar to those involved in the instant case. We quote from the opinion of the Court as follows:
"The case presents the sole question whether the defendants were guilty of negligence contributing proximately to the accident, in the operation of the bus under the following circumstances: The bus was proceeding in a northerly direction on San Pedro road, a paved highway having a width of about 40 feet. It was traveling at about twenty-five miles per hour on the east half of the highway with its right wheels 7 or 8 feet from the right edge of the pavement and the left wheels within 2 or 3 feet of the center of the highway. Traffic was heavy in each direction. The bus driver testified that he observed a car coming from the opposite direction at a distance of about 300 feet and at a speed of 50 or 55 miles per hour; that it was 'just straddling the center line half and half' and passed two other cars going in the same direction; that he did not alter the course of the bus; that the car returned to the west side of the highway after passing the other cars; that it came over to the east half of the highway when about 30 feet away from the bus; and that at that time he turned the bus slightly to the right. The side of the bus, about 10 feet from the front on the left side, was struck by the car, and plaintiff, who was riding with his arm on the sill of a window he had opened, was struck at or above the elbow, receiving serious and permanent injuries to his arm.
"If there was negligence on the part of the driver of the bus, it is to be found in the evidence that the bus was driven close to the center line of the highway and proceeded straight ahead, with practically no deviation from its course, after the driver had observed the approaching car being driven at excessive speed and a part of the time on the cast half of the highway." *Page 356 
"The evidence showed that the bus and the car approached each other at a combined speed of 75 miles per hour or at the rate of 110 feet per second. This would allow the approaching car less than three seconds to travel from the point where it was first observed passing other cars to the point where it struck the bus. Whether it was reasonable to believe that the car in such an exceedingly brief period could have been driven back to its own side of the road and then again to the wrong side, where it struck the bus, is debatable. The trial court was required to weigh the improbability that the car could have been or was operated in this erratic and difficult manner against the assertions of the bus driver that it was so operated. There was ample time in which to move the bus over to a safer position after the driver first saw the approaching car on the wrong side of the highway."
The Court sustained judgment of recovery for plaintiff.
We have not found it necessary in this case to discuss the testimony of the bus driver bearing upon the alleged maneuver of the truck in suddenly darting from the opposite shoulder of the road into the side of the bus, because we do not believe that the acceptance, vel non, of this fact has any bearing upon a determination of the question of negligence, or fault, or failure of the exercise of the requisite degree of care and caution on the part of the bus driver. It is definitely established that the danger was apparent and that the existence of such danger was ignored by the bus driver until too late.
In other days, the approach of a runaway team indicated to the driver of every vehicle the necessity of pulling as far away from the course of such runaway as conditions would permit, and no wise driver waited until almost the very instant of collision in order to observe this precaution. By analogy, a recklessly driven motor vehicle in these days is nothing more nor less than a runaway, and the generations' old rule of caution still applies, obligating all within the zone of danger to move as far as possible out of the course of the approaching peril.
We see no need in quibbling over points of fine distinction concerning terms as to degree of care. It is our holding on the basis of the facts we have found in this case that the driver of defendants' bus failed to exercise even an ordinary degree of care and caution, and is clearly chargeable by such fault with liability for injury to a passenger in the bus.
However, we do feel with regard to this case that it is not out of place to observe, even under penalty of an expression of opinion which is purely obiter, that the burden of gross negligence which resulted in the accident rests upon the driver of the Army truck. It is to be regretted that the theory of sovereignty applied in a case of this character serves to effect a gross injustice. If our opinion could carry any weight, we would not hesitate to recommend to the Congress a special act which would provide relief by way of indemnity to those parties who are cast for damages in this cause.
The only remaining point in this case, which demands our attention, is that of fixing the quantum of damages. The judgment of the lower Court awarded the sum of $12,500 for pain, suffering, injuries, disabilities and impairment of health sustained by the plaintiff, together with the additional amount of $2,808.46, representing monies actually expended and obligations incurred on account of medical attention and treatment of plaintiff, making a total judgment of $15,308.46, said judgment being in solido against all defendants, with the exception of the Travelers Insurance Company, against which the judgment was restricted to the limit of liability provided in its policy of insurance in the amount of $10,000.
Defendants complain that the quantum of damages as fixed in the judgment of the district Court is substantially too high, and, in answer to the appeal, plaintiff seeks an increase of the judgment to the sum of $25,000.
This case has at least one pleasing aspect, namely, that there is no conflict of medical testimony. There were only two medical witnesses, Dr. H.A. Durham, specialist in orthopedic surgery, and Dr. J.R. Brown, and both doctors agree that plaintiff suffered a serious, painful and disabling injury.
The facts show that at the time of the collision plaintiff was sitting on the left-hand side of the bus with his left knee propped or resting against the side of the vehicle. As it happened, this particular point of the bus received the full impact from the truck and plaintiff's left leg was shattered and mangled. After receiving *Page 357 
emergency treatment at Minden plaintiff was brought by ambulance to the Tri-State Hospital in Shreveport, where an operation was performed by Dr. Campbell, then an associate of Dr. Durham's, for a compound comminuted fracture of the left femur. Plaintiff had sustained a fracture through the middle of the lower third of the femur, a compound fracture of the left femur through the knee joint, a fracture of the patella, and a fracture of the left femur at the upper end, which was not at first discovered. An operation was immediately performed on the left leg, a plate, which extended down and underneath the knee joint, was inserted, and the lower end of the thigh bone was reduced as much as possible. Dr. Durham testified that several loose pieces of bone were taken out of the leg, screws were used to hold the plate, and the knee cap was found to be so badly crushed that an incision to remove it would have been dangerous.
Plaintiff remained in the hospital until January 30, 1943, when he was permitted to return to his home, though still confined to bed.
The history of the treatment of plaintiff's injuries and the effects of the injuries makes a long story of operations, blood transfusions, sulfa drug infusions, casts, braces, intense suffering and pain, which we do not feel it necessary to set forth in detail. No attempt is made by defendants to question the serious nature and character of plaintiff's injuries nor to minimize the suffering, inconvenience, discomfort and possible permanent effects of the injuries. At the time of the trial in June, 1944, eighteen months after the accident, plaintiff was still suffering pain from his injuries, his leg was swollen and draining pus from a low-grade infection of the operative wounds, and his general health was unquestionably seriously impaired. The question of the advisability of amputating the leg was still being debated by his doctors. The testimony of plaintiff, his wife, the doctors, and the nurse who attended him for a period of several months, definitely and conclusively establishes the serious nature of the injury. Plaintiff at the time of the accident was 37 years of age and in good health. The abundant and uncontroverted evidence in the record as to plaintiff's condition definitely establishes the fact that his left leg will be of no further use or service, and he is consequently disabled for life, to that extent if to no other. But, it was also established that plaintiff's general condition of health has suffered severely from the pain, suffering and shock attendant upon the injury.
[7] In considering the quantum of damages this Court has heretofore given expression to the principle of considering the decreased purchasing power of the dollar and the ability of defendants to answer in damages, Scott v. Claiborne Electric Cooperative, Inc., et al., La. App., 13 So.2d 524; Weadock v. Eagle Indemnity Co., La. App., 15 So.2d 132. The District Judge also referred to the case of Mallard v. State, La. App., 194 So. 447, in which damages of $12,500, in addition to recovery for medical services and attention, were allowed a 31-year old logger earning $100 per month, who was left crippled for life as the result of an accident.
The plaintiff in the case before us was earning wages of from $32 to $41.60 per week and had a life expectancy of 30 years.
Plaintiff has suffered a permanently disabling injury, and, in our opinion, will continue to suffer considerable pain, to say nothing of discomfort and inconvenience at intervals for the remainder of his life.
[8] Under the circumstances, we find the award neither excessive nor inadequate.
For the reasons assigned, the judgment appealed from is affirmed at appellant's cost.
 On Rehearing.