This is a suit for damages alleged to have resulted from an injury received by plaintiff while a paying passenger on a bus operated by the Interurban Transportation Company, Inc. As the result of successive mergers the Southern Bus Lines, Inc., has become the successor in business of the Interurban Company, and appears to be the real party defendant, but also named are the Tri-State Transit Company of Louisiana, Inc., and the American Fidelity Casualty Company as insurer.
The accident out of which this suit arose occurred between 10:30 and 11:00 o'clock on the night of June 21, 1945. At that time plaintiff was a Sergeant in the United States Army, stationed at Camp Beauregard Field, Louisiana. On the evening in question plaintiff had been on pass in the City of Alexandria and he and two companions boarded the interurban bus at about 10:30 P.M., having bought and procured tickets, for the purpose of returning to their stations. The route of the bus lay over what is known as the old traffic bridge across Red River, which connects the foot of Murray Street in Alexandria with the foot of Main Street in Pineville. The floor of the bridge is eighteen feet, seven and three-quarters inches in width and along each side of the floor is laid a six by eight wooden guard rail, which results in lessening the actual traffic width of the bridge by sixteen inches. The superstructure of the bridge is constructed of iron or steel and the first supporting girder, which is only a few feet within the actual entrance to the bridge, and at which point the accident is alleged to have occurred, rises from the floor of the bridge at an angle from the vertical, that is, it slopes diagonally away from the Alexandria end of the bridge. Murray Street, which is twenty-four feet in width, debouches upon the bridge, which veers at a slight but perceptible angle of *Page 284 
something more 'than five degrees to the left. There is a steep upgrade on Murray Street approaching the bridge and then a slight downgrade to the mouth of the bridge.
Traffic over the bridge, particularly during war time, was exceedingly heavy, and it is to be observed that the clearance for passage of vehicles was very slight, necessitating the direction of the course of vehicles as close to the superstructure on either side as might be possible. The danger to occupants of vehicles as the result of this necessity is apparent, and it is shown that defendant's drivers were carefully instructed, before entering upon the bridge, to warn passengers of the danger of permitting any parts of the body to project outside of the bus.
The bus in question, on which plaintiff was a passenger, was a rather light Chevrolet model, apparently of about the type and nature of the average school bus, and, as a matter of fact, when defendant disposed of a number of its busses after the rush traffic period of war time, this particular bus was sold to a private individual who used it in school service.
On this occasion the bus was loaded to capacity and a number of passengers were standing in the aisle. Plaintiff was seated next to the window on the right-hand side of the bus on the next to the last double seat in the rear, with one of his companions on the seat beside him, and the other immediately behind him, on the last seat in the bus. Most of the facts in connection with the accident are definitely established without any serious contradiction and may be briefly recapitulated.
Beginning the ascent upgrade the driver put the bus in low, or, as he expressed it, "double low" gear. Upon reaching the top of the crest and beginning the downgrade he shifted into second gear, skipping low, and at a point only some four to six feet before the vehicle entered upon the bridge proper, according to his testimony, supported by that of three other witnesses, the driver warned the passengers of the bus to "watch their heads and arms in the windows on account of the narrow bridge." The driver testified that he gave this warning without turning his head but while looking in the inside mirror which gave him a view of all the passengers in the bus. It is true that plaintiff and his two companions testified they did not hear this warning, but this fact loses its importance in view of our findings hereinafter expressed.
As the rear portion of the bus was opposite the first girder on the right of the bridge there was heard, as testified to by all six of the passengers who were witnesses upon trial of this case, and the driver, the sound of a blow, variously described as a "lick" or a "thud," and immediately plaintiff was heard to cry out that he was hit. The driver immediately brought the bus to a stop and plaintiff made his way out of the bus and on to the bridge. Indeed he had been hit, for he was suffering from a complete compound fracture of the right humerus at the junction of the middle and upper thirds thereof and was bleeding profusely. A tourniquet was applied and plaintiff was taken by an Army officer in his private automobile to the Charity Hospital in Pineville, where first aid treatment was administered, after which he was taken to the hospital at Camp Livingston in an Army ambulance.
After trial of this case there was judgment in favor of defendant rejecting the demands of plaintiff, from which plaintiff has brought this appeal.
The determination of this case must rest entirely upon the resolution of a question of fact, namely, whether the injury to plaintiff's arm was sustained while his arm was projecting outside the bus or while the arm was entirely inside. This is the crux of the matter.
[1] As to the law applicable, there is no serious difference of opinion. Admittedly plaintiff was a paying passenger and defendant occupied the status of a public carrier at the time of the accident. It is too well established to need more than passing comment that, as a public carrier, defendant was required to exercise the utmost degree of care and further required to show absolute freedom from negligence. Hughes v. Baton Rouge Electric Co., La. App., 188 So. 473; Oppenheim v. Toye *Page 285 
Bros. Yellow Cab Co., La. App., 7 So.2d 420; Brown v. Homer-Doyline Bus Lines, La. App., 23 So.2d 348.
The defense urged in this instance is that plaintiff was guilty of contributory negligence, particularly in that his arm was projecting out of the open window of the bus in such manner as to come in contact with the bridge girder, thereby causing the injury for which damages are sought. Consideration of this defense is comprehended in the necessity for determination of the fact which we have above stated.
Despite the fact that the bus was crowded to capacity there was no single witness who could testify with certainty as to the exact facts of the accident. In other words, there were no eyewitnesses, and the evidence is therefore purely circumstantial in nature, and we must deduce the facts as best we may from the physical surroundings and factors which may have some bearing upon the cause of the accident.
In summing up his reasons for judgment, as advanced in a seriously considered written opinion, the judge of the district court made the following analysis:
"Due to the fact that no other passenger was injured; that plaintiff's arm was badly lacerated; that blood was found on the outside of the bus; that no visible sign of a collision was on the outside of the bus, the court can reach no conclusion other than plaintiff's injured arm resulted from its being extended from the bus while moving in the very narrow passage-way on the bridge as shown."
If we could agree with our learned brother in his findings on all these several items, we would certainly have no difficulty in arriving at the same conclusion. Unfortunately, however, we think it is established beyond any contradiction that plaintiff's arm was not badly lacerated, and that there were
visible signs of a collision, or at least of contact with some foreign body, on the outside of the bus. These particular points stated as facts by the district judge must be eliminated and exactly the opposite facts substituted, thus requiring study and analysis from an entirely different point of view.
In analyzing the circumstances involved in this matter we shall attempt to set forth the several factors upon which we feel a conclusion must ultimately rest, together with the testimony bearing thereon.
To begin with, there is no question but that the driver of the bus was required to swerve the vehicle to the left immediately upon entering upon the bridge. At the time of this required operation, or at least within a space of some four feet therefrom, according to his own testimony, the driver had his eyes upon the mirror in the bus and was warning his passengers. It is obvious therefore that no matter how briefly the driver turned his eyes from the delicate operation of negotiating an exceptionally narrow passage, upon returning them to the roadway he was forced to veer or turn somewhat sharply to the left. Unquestionably, this operation caused the bus to sway, not with a skidding motion but with a leaning movement of the body of the bus. It is shown that the body of the bus projected some eight inches outside of the wheels, exactly the width of the guard timber at the foot of the girder. It is therefore evident that even the slightest sway or lurch of the body at a tangent, which tangent would have been to the right, inasmuch as the turn of the bus was at an angle to the left, could have brought, and we think did bring, the side of the bus into a brief passing contact with the edge of the bridge girder.
The bus driver and the other three witnesses for defendant, passengers in the bus, together with plaintiff and his two companions, who were witnesses on his behalf, all testified that there was some sort of perceptible noise which was immediately followed by plaintiff's cry that he had been hit. This noise, as we have stated, was variously described as either a "lick" or a "thud." The bus driver testified it was a "loud lick." The three passengers, witnesses for defendant, testified that it was sort of a "thud," but unquestionably it must have been loud else it would not have been heard or noticed by these three witnesses, who were removed almost the entire length of the bus from plaintiff's position, above the noise attendant upon the usual laughter and talking of a capacity crowd of passengers, *Page 286 
many of them soldiers and some of them in various stages of intoxication, from little to much. Plaintiff and his witnesses testified, in addition to the noise, to feeling a jar, and the witness, Bock, who was sitting on the seat next to plaintiff, testified that it was of such severity as to throw him off balance to such extent that he found it necessary to catch himself with extended arm upon the seat across the aisle.
[2] Now, upon the question as to the position of plaintiff's arm at the time of the accident, we have the testimony of plaintiff and his two companions, all of whom swore that at the time both of plaintiff's arms were inside the bus, and, according to the testimony of plaintiff and his seat companion, both hands were twisting his cap, which lay in his lap. This testimony is positive and uncontradicted. There is no other testimony of any other witness as to the position of plaintiff's arm. We fully realize the sanctity of the time honored rule that great weight must be attached to the findings of a trial judge who has had the opportunity to observe the witnesses upon the stand and to evaluate such testimony in connection with the conduct, demeanor, bearing and manner of such witnesses at the time of testifying, and we thoroughly subscribe to the principle upon which this precedent is based. Nonetheless, we are at a loss to justify a line of reasoning which, without a single word of comment detrimental to the witnesses in question, completely and utterly disregards the plain, straightforward, positive, unimpeached and uncontradicted testimony of three men bearing upon one single simple fact. Yet, the esteemed judge of the district court did just this thing and set forth as his only explanation that there was no reason for plaintiff's two companions "at the precise moment of the accident, to be watching his arm closely enough to see what he was doing with it."
We wish to emphasize the fact that there does not have to be a reason for witnesses seeing or failing to see a single particular incident, no matter how unimportant it might seem. These witnesses testified that they did see a certain thing, and we note that even distinguished counsel for the defendants made no attempt to press them under cross-examination on this point, and, as a matter of fact, he did not direct one single question along this line.
For ourselves we cannot justify the elimination of the clear and unequivocal testimony of these witnesses from the consideration of this point.
As to the nature of the injury itself, we are impressed with the fact that, contrary to the observation of the district judge, there was no laceration nor bruising of any portion of plaintiff's arm except that caused by the compound fracture of the heavy bone of the upper arm. Plaintiff himself testified that there was a slight scratch upon the upper forearm but there were no bruises, no visible marks nor evidences, even of a superficial nature, on any other part of the member. We cannot conceive, within reason or possibility, of any position in which a man might place his arm outside of the window of a vehicle of this nature in such a fashion as to subject it to a sharp blow of sufficient severity to snap the bone and project the ends thereof through the flesh without touching any other portion of the arm.
We are further confronted with the physical facts which seem to us to militate against any logical reasoning leading to the conclusion that plaintiff's arm was projecting outside of the vehicle. The window of the bus by which plaintiff was sitting was not completely down flush with the sill but was elevated some four inches thereabove. Plaintiff would have had to place himself in a most awkward and unnatural position by elevating his arm from the shoulder in order to extend it out of the window. This circumstance appears to us to stand as physical corroboration of the truth of the testimony to which we have referred.
As to the existence of any marks on the outside of the bus, while the testimony is not as clear and definite on this point as might be wished, it is nonetheless conclusively established that there were marks indicating that the bus had come in contact with some object. There was a dent in the outside of the channel iron of the window; the paint was scraped off the rubmolding *Page 287 
running lengthwise of the bus below the window; the window capping was indented; the channel iron on the rear portion of the window was bent, and the post capping was dented and scraped. In addition to these evidences of contact on the outside of the bus, it is established that the glass and sash of the window were broken. All of the damages on the outside of the bus were within a comparatively small area about and immediately surrounding the window. Much was made by zealous counsel for the defendants, on trial and in argument, of the fact that the drip molding at the top of the bus showed no evidence of injury. It is quite clear to us that the fact that the bridge girder is set at a slant eliminates this fact from consideration as being of any importance whatever. If the girder had been exactly vertical then indeed we think the point might have some significance, but it is apparent, bearing in mind the construction of the bridge and the relationship of the bus to the girder, that the central portion of the body of the bus, that is, that part surrounding the windows, could easily have been momentarily thrown against the girder, thereby sustaining evidences of damage which would not be demonstrable on the upper portion of the body, which would have escaped contact by reason of its difference in height in relationship to the slant of the girder.
Emphasis has further been laid on the fact that there was evidence of blood on the outside of the bus, but, again, we attach no significance to this showing. The preponderance of the testimony shows that there was a great deal more blood on the inside of the bus, a good part of it being, according to the testimony of one of defendant's witnesses, on the arm padding, the cushions and the back rest of the seat. To our minds it is easy to understand how some little part of the blood spurting from the jagged wounds caused by the protusion of the bones through the flesh could have dripped down on the outside of the bus as the plaintiff rose from his seat immediately following the injury.
[3] After careful consideration in the light of the undisputed and unattacked testimony of apparently credible witnesses, which testimony is supported and corroborated by physical circumstances surrounding the incident, we conclude that at the time of the accident plaintiff's arm was inside the bus and it necessarily follows by reason of this fact that he must be absolved of any charge of negligence which in any way contributed to the accident and the resulting injury.
It appears clear to us that plaintiff's injury was caused by a sharp contact of the bus with the girder of the bridge. This conclusion is amply substantiated by the testimony in the record as to evidences of damage appearing on the outside of the vehicle in immediate proximity to the window by which plaintiff was sitting at the time. Obviously, the momentary collision resulted from the negligence of the driver of the bus, slight though it might have been, in operating the vehicle in such manner as to cause it to come in contact with the girder. This negligence unquestionably was the proximate cause of the accident, and, in view of our finding that plaintiff was free of any contributory negligence, of course, such fact fixes liability upon defendants.
In our discussion we have disposed of the summation of all the reasons for the judgment as given by the district judge with the exception of one which our learned brother regarded as being persuasive, namely, that no other passenger was injured. To our minds this proposition will not bear examination. As well say that in a tragic accident where all occupants of a vehicle are killed with the exception of one that that one does not live. It is impossible for the human mind by application of finite processes of logical development to explain details or to assume reasons as to why certain apparently impossible things happen in certain accidents. But again we appreciate no great difficulty in finding a reasonable explanation for the fact that plaintiff alone of all the passengers on the bus received an injury since the point of the sharp, instantaneous impact was immediately against that part of the vehicle in which plaintiff was seated at the time. *Page 288 
Exactly how the accident occurred no man can say with certainty, but we think it most probable that plaintiff, who weighed between 168 and 175 pounds at the time of the accident, sitting relaxed and inert in his seat, was thrown with considerable violence against the sash of the window, or the projecting metal handle, or the edge of the window itself, any one of which, as we picture the relation of their location to plaintiff, would have been at approximately the height calculated to bring plaintiff's arm in contact therewith at the exact point of the resulting fracture.
[4] It is not necessary that the court explain in detail, and beyond any possibility of dispute, the exact and certain manner in which the injury was sustained. The finding of negligence on the part of the defendant's driver and of freedom from negligence on the part of plaintiff, a paid passenger on a public carrier, is sufficient to fix liability upon defendants.
The following concession, which is correctly made in brief of distinguished counsel for defendants, accords with our views as above expressed:
"If the court in this case finds that plaintiff's arm was crushed and mangled as it was while it was completely inside the bus, then unquestionably the court will have to find the defendant liable for plaintiff's injury because we find it impossible to explain the injury in any other manner than that the arm was outside the window."
With regard to the quantum of damages the facts show that plaintiff suffered severe pain for a period of about five weeks and a lesser degree of pain for a considerable time thereafter, which, in fact, endured in some degree even at the time of trial; that his arm was kept in a cast about three months; that he was hospitalized for a period of about eight months; that his discharge from the Army was delayed by reason of the accident; that he sustained, in addition to physical pain, considerable mental anguish which was increased by reason of the fact that his wife was pregnant at the time of the accident and learned of his misfortune from outside sources while he was in the hospital, and the further fact that his son was born to his wife prematurely on November 28, 1945, and that by reason of his detention in the hospital he was unable to be at her side.
At the time of the accident plaintiff was 33 years of age. He had entered the Army on July 30, 1942, served overseas for slightly more than fifteen months, had been returned to the United States on January 15, 1945, and would have been eligible for discharge in September of the same year, but his severance from service was actually delayed until February 14, 1946, as the direct result of the accident.
Prior to his service in the Army plaintiff, whose education was limited to seven years of grammar school, was a shaper hand and a steel saw operator, whose average earnings, according to his testimony, were $50 to $60 a week based on a rate of ninety-three cents an hour. According to plaintiff's testimony this rate of pay at the time of trial of the case had increased to $1.25 per hour, which would have represented a corresponding increase in his weekly earning power.
There is no question as to the fact that plaintiff is disabled and incapacitated from pursuing the trade which he followed prior to the accident. The testimony, by deposition, of Dr. Gene D. Caldwell, a specialist in orthopedic surgery, who was the only expert medical witness, is uncontradicted. The only other medical testimony in the record was that of Dr. Frank Glassman of Chicago, whose testimony, also by deposition, was limited to his experience in treating plaintiff for a few days immediately following the injury.
According to the testimony of Dr. Caldwell, based upon an examination of plaintiff on June 10, 1046, plaintiff was suffering from an atrophied condition of the right arm, shown to be about two inches with respect to the upper arm, and two and a quarter inches with respect to the forearm; a serious limitation of motion in the right elbow; a thinning of the joint space and some arthritic change, all of which, in the opinion of the witness, *Page 289 
justified the conclusion that plaintiff had sustained a 75% loss of function of the right upper extremity insofar as his civilian occupation as a machine shop worker is concerned. The witness further expressed the opinion that the loss of function was likely to remain permanent, and that he did not regard as a strong possibility any improvement in plaintiff's condition in the future.
Plaintiff prayed for total damages in the sum of $26,000, which he itemized in his petition as follows:
"For permanent injury and loss of future earnings ........................... $20,000.00 For physical suffering, agony, mental and nervous shock ..................... 3,000.00 For prolonged service in the Army and incidental damages .................. 3,000.00 ---------- $26,000.00"
The question of quantum was not accorded any considerable attention by defendants on trial and no reference has been made to such matter in briefs by defendant's counsel before this court, and the responsibility of fixing the amount is therefore tacitly left, insofar as defendants are concerned, to the court.
[5] We think the claim for physical suffering, agony, mental and nervous shock is well substantiated, but that the amount claimed is somewhat excessive, and, in our opinion, the sum of $2,000 appears to be a more reasonably proper allowance under this item.
[6] We do not find any proper basis for an allowance of the item claimed by reason of prolonged service in the Army and incidental damages, and, accordingly, the same is refused.
[7] With respect to the permanent effects of the injury and the loss of future earnings resulting therefrom, we take into consideration the decreased purchasing power of the dollar a principle which has been enunciated by this court in Scott v. Claiborne Electric Cooperative, Inc., La. App., 13 So.2d 524; Weadock v. Eagle Indemnity Co., La. App., 15 So.2d 132; and Brown v. Homer-Doyline Bus Lines, La. App., 23 So.2d 348.
Unquestionably, plaintiff has suffered permanent and lasting injury. As to the effect of this injury upon his future earning ability, there can be no adequate standard for computation. It may well be that, availing himself of the advantages of vocational training which will be provided by a grateful government in recognition of his services in the armed forces, plaintiff may so prepare himself for some trade or occupation as will permit him in future to earn as much or more than he might receive as a shaper hand or steel saw operator. But, there is no basis for a conclusion to this effect, and, therefore, we must revert to a consideration of the degree of his incapacity with respect to his ability to perform the same or similar operations required in the trades which he followed prior to his service in the army. Plaintiff's own testimony is ground for the conclusion that he is not totally disabled even from following his old trades. His testimony in this connection, which has most favorably impressed this court as being fair, uncolored and objective, indicates that he is still able to operate and perform some precision work on a shaper machine with the aid of an automatic feed. We reasonably assume the difficulties that stand in the way of plaintiff procuring such limited employment and the loss of earnings that would be attendant thereupon.
[8] Taking into consideration all the facts established and adjusting same as best we can with the future probabilities as based upon plaintiff's life expectancy and the established fact of his partial permanent disability, we feel that an award of $12,500 under this item would represent substantial compensation.
For the reasons assigned the judgment appealed from is reversed and set aside, and there is now judgment in favor of plaintiff, Stephen M. Jakubec, and against the defendants, Interurban Transportation Company, Inc., Tri-State Transit Company of Louisiana, Inc., Southern Bus Lines, *Page 290 
Inc., and the American Fidelity Casualty Company, in solido, in the full sum of $14,500, together with legal interest thereon from date of judicial demand until paid, and for all costs.