MARY JANE ADAMS, A MINOR, BY RAYMOND I. ADAMS, HER NEXT FRIEND, RAYMOND I. ADAMS, INDIVIDUALLY AND RAYMOND I. ADAMS, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF MARY A. ADAMS, DECEASED, PLAINTIFFS-RESPONDENTS, v. ATLANTIC CITY ELECTRIC COMPANY, DEFENDANT-APPELLANT.

Argued February 4, 1938—Decided May 11, 1938.

For the appellant, *Thompson & Hanstein* (*Walter Hanstein* and *Mark Townsend,* of counsel).

For the respondents, *Garrison & Weaver* (*William I. Garrison,* of counsel).

The opinion of the court was delivered by

PERSKIE, J.  This is an action in tort.  Appellant, Atlantic City Electric Company, who was the defendant below, appeals

from a judgment, on a jury verdict originally in the sum of $40,000, in favor of the infant plaintiff, Mary Jane Adams, for personal injuries which she sustained while an occupant of an automobile which collided with a pole belonging to appellant, and which pole carried wires for the transmission of electricity of high voltage. On a rule to show cause, upon the sole ground that it was excessive, the verdict was reduced to $30,000, and as so reduced was formally accepted for the infant plaintiff. Appellant also appeals from the judgment, based upon the verdict of $1,464.80 returned by the same jury in favor of the father of the infant, Raymond I. Adams, for his consequential damages.

John Adams, a minor, was graduated from the Atlantic City high school. His cousin, Emily Finley, who resided near Cape May Court House, New Jersey, was also graduated. Emily's mother planned a joint party at her home to celebrate the graduation of both children. Notwithstanding the fact that John was affected with "valvular lesions of the heart" and had been forbidden by his physician to drive an automobile (although a few days before the accident his physician told him that as between driving to Philadelphia or Cape May, he had better drive to Cape May), John did in the late afternoon of June 17th, 1936, drive a car, owned by his father, and used for business and family pleasure, to attend the party at his cousin's home. John had his father's consent. With John were his mother, Mary A. Adams, who sat on the front seat, and his sister, Mary Jane Adams, about thirteen years of age, who sat on the rear seat. In order to reach his cousin's home John had to and did travel part of the way over state highway No. 4, from Swainton to Cape May Court House. This highway, it appears, is surfaced with concrete to a width of about twenty feet. On each side of the concrete there is a gravel shoulder to the width of about seven feet which, on the day in question, was surfaced with either some road oil or bituminous substance that rendered the shoulders fit and suitable for vehicular traffic.

Appellant is engaged in the business of selling electric power or current; it conducts its business, among other

places, in Cape May county. In the pursuit of its business, appellant erected, maintained and controlled certain poles upon which were strung wires for the purpose of transmitting its electric current along state highway No. 4. It also maintained substations at Ocean View, about seven and one-half miles from the scene of the accident, hereinafter described, and at Wildwood and Cape May. The current, estimated at sixty-six thousand volts, is generated at its main plant at Deepwater, on the Delaware river. At the Ocean View substation it was reduced to twenty-two thousand volts and sent over the transmission lines to the Wildwood and Cape May substations, where it terminates in circuit breakers protected by relays, and where the current was further reduced to 440-220-110 volts, being the amount suitable for home and store use. The interconnecting lines between Ocean View, Wildwood and Cape May substations are known as a loop circuit. This loop circuit provides alternative service from the Ocean View substation to either the Cape May or Wildwood substation. Thus if the Wildwood line from the Ocean View substation is disconnected at both ends, electric power is supplied to the Wildwood substation over the Cape May line. Similarly, if the Cape May line is disconnected at both ends, current would be supplied from the Ocean View substation over the Wildwood line. Each of these substations contains modern, automatic oil circuit breakers operating upon relays and thus connected with the lines. These relays, operating through electric impulses, are of two kinds, one known as a time delayed relay and the other as an instantaneous relay. Their function is to open the circuit breaker and de-energize the line when a fault or abnormality on the line occurs.

As John, his mother and sister were riding along said highway No. 4, and about seven and one-half miles from the Ocean View substation, the car for some unexplained and unproved reason, skidded or turned off the road to the right, into a field or grass plot, then took a diagonal or southeasterly course back towards the roadway, but before reaching it, collided with appellant's pole No. 1382. This pole was set within the fifty-foot right of way of said highway and one

and nine-tenths feet west from the westerly edge of the gravel shoulder and usable part of the highway. It was a western red cedar pole, forty-five feet in length, weighed one thousand one hundred pounds, carried three cross-arms on which rested six No. 2/0 bare copper wires of a tensile strength of five thousand two hundred and twenty-six pounds, carrying twenty-two thousand volts of electricity. The lowest wire was thirty-six feet six inches above the ground level. As a result of the impact between the car and the pole, the pole was fractured and splintered at a point about five feet above the ground and the base thereof was moved one and one-half feet, thus causing a hole in which the front right wheel of the car rested. The front axle and running board of the car rested upon the ground and jammed up against the pole which had a lightning rod affixed thereto.

The results to the occupants of the car were tragic. The car became highly energized, by reason of the electric current passing through it to the ground. The mother died before she was removed from the car, and there was evidence indicating that she sustained a broken neck and a fracture of the base of her skull. John died two days later without ever regaining consciousness. Mary Jane was so horribly burned by electricity that the second, third, fourth and fifth fingers of her left hand dropped off at the first joint and all the toes of her right foot dropped off completely, devitalizing the tissues. In addition, she was otherwise severely burned in and about her limbs and body. A plastic operation was necessary and performed. The skin was pulled over the end of the fingers and toes so that they would be made reasonably presentable.

We mark the fact that as a result of this accident, which happened on June 17th, 1936, about six P. M. (D. S. T.), two separate suits were instituted. In one suit, Mary Jane Adams, by her father as next friend, sued for the injuries which she sustained; the father sued for the consequential damages which he sustained. The father also sued as administrator *ad prosequendum* for the alleged wrongful death of his wife. In the other suit John J. Palmer sued to recover for the injuries which he suffered as the result of electric burns

while in the humane act of attempting to extricate the mother from the car. No action was instituted for the death of John. The two suits were tried together. The jury returned verdicts in the amounts already stated in favor of the infant plaintiff and her father; it returned a verdict of no cause of action for the death of the mother. From that judgment there is no appeal. It also returned a verdict of $25,000 in favor of Palmer which, on a rule to show cause, was reduced to $18,750, but as so reduced was not accepted and this cause is now awaiting re-trial.

Under its sixteen grounds of appeal, appellant now argues that the judgments recovered by the infant plaintiff and her father, sole respondents here, be reversed for the reasons that the learned trial judge erred in refusing to nonsuit and to direct a verdict; in admitting certain evidence; in certain phases of his charge; and in refusing to charge certain of appellant's requests to charge.

A proper consideration and disposition of this argument requires, *in limine,* a brief analysis of the issues involved.

Many and varied are the acts of negligence, as alleged in paragraph 4 (as amended) of the complaint, upon which plaintiffs sought to impose liability upon appellant. More specifically, however, the acts of negligence alleged consist of two major charges. First, plaintiffs charged that appellant was negligent in that it maintained within the boundaries of public highway No. 4 its transmission wires on a pole which by reason of decay had become weakened, unsound and insecure for its intended uses and purposes and that the appellant had knowledge of the unsuitable condition of the pole. Second, plaintiffs further charged that appellant was negligent in that it failed to discontinue promptly the transmission of deadly electric current through or over its wires which were supported by the unsuitable pole after it had received notice of the existence of trouble or of some abnormal condition on its wires. Plaintiffs further charged that the negligence in each instance was the efficient and proximate cause of the injuries and loss suffered by them.

Generally stated, appellant denied the alleged acts of negligence; it denied that either act charged was the efficient and proximate cause of the injuries and loss sustained by plaintiffs. Appellant pleaded contributory negligence and assumption of risk; it further sought to avoid liability upon the theory that it had fully discharged its duty towards the plaintiffs in that it promptly did that which well regulated companies would have done in like circumstances, *i. e.*, it followed the approved or standard practice in the circumstances.

Upon these issues and without variances, as urged by appellant, this cause was fully tried upon the merits and submitted to the jury for its determination.

*First:* The principles of law applicable to these issues are well settled. Whoever uses, controls or manages a highly destructive agency (electric current) is held to a correspondingly high degree of care. *Anderson* v. *Jersey City Electric Light Co.*, 63 *N. J. L.* 387, 390; 43 *Atl. Rep.* 654; *Heyer* v. *Jersey Central Power, &c., Co.*, 106 *N. J. L.* 211, 214; 147 *Atl. Rep.* 452. And while the degree of care which is required is that which is exercised by persons of ordinary prudence under same or like circumstances, and while the adoption and operation of a method which accords with that in general use by well regulated companies and approved by experience is a due performance of duty and care owed (*Heyer* v. *Jersey Central Power, &c., Co., supra* (at *p.* 213), and cases cited), the care to be exercised, the duty to be fulfilled, means more than the mere employment and use of approved mechanical appliances. Rather does it mean the exercise of that degree of care, of that manner of fulfillment of duty, which comprehends a circumspection, a foresight, a prevision which has due and proper regard to reasonably probable contingencies. *Anderson* v. *Jersey City Electric Light Co., supra,* and *Heyer* v. *Jersey Central Power, &c., Co., supra.* Otherwise stated, we have said that "*the test of liability to a particular person is whether injury ought reasonably to have been anticipated.*" *McGinnis* v. *Delaware, Lackawanna and Western Railroad Co.*, 98 *N. J. L.* 160; 119 *Atl. Rep.* 163; *Guinn* v. *Delaware*

and *Atlantic Tel. Co.,* 72 *N. J. L.* 276; 62 *Atl. Rep.* 412; *Robbins* v. *Thies,* 117 *N. J. L.* 389 (at *pp.* 393, 394); 189 *Atl. Rep.* 67. In accordance with these principles we have held that an electric company owning and controlling a high tension line along a much traveled thoroughfare is under a duty, after knowledge of an accident and trouble along its line at a certain point, *without unreasonable delay* to refrain from transmitting electrical energy at that point which may cause injury to persons lawfully upon the highway, or otherwise to safeguard such persons. And we have further held that the jury may, if the proofs warrant, notwithstanding the employment of standard equipment and standard practices, conclude that there has been a failure to exercise the required degree of care. *Gereghty* v. *Wagner,* 117 *N. J. L.* 174; 187 *Atl. Rep.* 152.

Appellant, at the outset, argues that neither the Gereghty case nor the Robbins case is applicable. In each of these cases, it is argued, there was proof that the electric company involved had knowledge of the actual trouble and, notwithstanding that knowledge, continued for some considerable time thereafter to transmit deadly electric current over the wires, while in the case at bar, appellant contends, it had no knowledge of the actual trouble but merely had the general knowledge that there was some abnormal condition or trouble over its wires. The distinction made is without merit. For knowledge of the *actual* trouble or abnormality is not necessary. Once *general* knowledge is made to appear, it must then be determined whether appellant did in fact act in accordance with standard or approved practices, and if the answer be in the affirmative, it must further be determined whether appellant otherwise exercised that degree of care which was commensurate with the existing and with the reasonably probable risks and dangers.

*Second:* In light of the aforesaid applicable principles of law, did the trial judge correctly submit this cause to the jury?

A. As to appellant's failure to discontinue promptly the electric current.

It appears to be conceded (appellant's expert witnesses' testimony is in fact to that effect), that the electric current passed through the car to the ground by way of the lightning rod due to the dislodgment of one of the high transmission lines rested on the cross-arms; and that as a result thereof, there was a "leaking and arcing" through the various wires which were not in metallic contact with each other. Finally, and within a relatively short period of time (there is a conflict in the proofs as to the period of time), the transmission line burned through and as a result of the arcing the live ends fell to the ground about fifty feet from the car. That, appellant says, caused the circuit breaker to trip open. Appellant's employe (Godfrey) in charge of its Ocean View substation, was not at his post at the time. He was "coming out of the operator's cottage, in the doorway of the shed, which was at the rear of the cottage," and was between "forty-five to fifty feet" from the room of the substation where the relays were located. He testified that his attention was attracted by the ringing of the alarm bell. He ran into the control room, shut off the alarm bell which automatically set the targets showing which oil circuit breakers had opened in their normal positions. The green pilot light indicated that the Wildwood and Cape May circuits had opened up. He re-closed both circuits; this resulted in the continuing of the flow of the deadly electric current. The Cape May circuit remained closed. The Wildwood circuit re-opened. He waited a while and again re-closed the Wildwood circuit. Again it re-opened. He then called and notified the load despatcher in Atlantic City. The several openings and closings, it is said by appellant, consumed but a very short time.

Appellant seeks to justify its conduct as essential because the territory covered by its service would be deprived of electricity during the period necessary to determine the exact cause of the trouble; that in this territory are numerous essential services, such as police and fire signals, hospitals and so on; that experience has demonstrated in ninety-one per cent. of the cases the cause of the opening of the circuit breaker is transitory in nature, such as a limb of a tree being

blown against the wire; that upon re-closure in these cases the circuit remains closed in eighty-five or eighty-six per cent. of the time upon the first re-closure and remains closed in an additional five per cent. in the second, leaving only nine per cent. where service cannot be re-established without the line being first patrolled; and that there is no device or instrument in the industry that will disclose to the operator of the substation the cause of the fault or abnormality on the line, and that the line must be patrolled to ascertain it.

The proffered justification is of no avail. The necessity of supplying the stated electric service was one of appellant's functions as a public utility. It is obliged to carry out that function with a degree of care corresponding to the reasonably probable risks or dangers involved totally irrespective of the essential and necessary nature of the services it renders.

In addition to justifying its conduct upon the grounds already stated, appellant contends that the proofs exhibited clearly indicated that plaintiffs sustained their injuries before the circuit breaker opened, and therefore it was free from any negligence causing those injuries, and thus absolved from liability. True, there was proof from which the jury might well have so found. But the proofs for the plaintiffs justified a finding to the contrary.

A brief summary of those proofs will suffice.

James J. Palmer, a nearby resident, came upon the scene of the accident within about three minutes after hearing the crash. He saw no sparks of fire at the top of the pole. He walked over to the driver's side of the car—the window was open—and found John slumped over the wheel. He said that John glanced at him but said nothing. He raised the boy's head and felt no shock. The mother then said, "My God, what has happened?" and thinking that she, because of blood on her face was more seriously injured than the screaming child on the rear seat, he went around to the mother's side of the car. The door was partly open. He fully opened it without feeling an electric shock, and attempted to take the mother out. She was a large woman and he found this difficult. He then put one hand on the roof of the car and

when he put a foot on the running board in order to brace himself, he received an electric shock that rendered him unconscious. The proofs, if believed, surely justified the jury in concluding that the car was not energized when Palmer came into contact with John by raising his head or when Palmer came into contact with the car when he opened the door sufficiently to extricate Mrs. Adams; that the car did become energized when Palmer braced himself to remove Mrs. Adams.

Other testimony adduced for the plaintiffs by witnesses Isaac Powell, Clarence L. Rice, Charles Green and Mae Powell tended to corroborate plaintiffs' version that their (plaintiffs) injuries were sustained between or after, and not before, the several closings of the circuit breaker.

The witness Fawcett, appellant's expert, admitted upon cross-examination, "if we assume they [facts in hypothetical questions] are true, the breaker probably would have opened prior to the receipt of the injuries."

The witness Derrick, another expert witness for appellant, upon cross-examination admitted that in a very few seconds after the crash, juice (electricity) began to go down the electric rod, and that no expert could tell for a certainty how many amperes went down the lightning rod. This testimony was contrary to appellant's other proofs, namely, that "due to the breaking of the contact of the lightning rod with the ground, a high resistance to current flow or amperage was not going to ground to work the *circuit breaker;* that the relay did not operate until the wire had parted and fallen to the ground some fifty feet away from the car; that until the line thus parted, the car continued to be energized, during which time plaintiff continued to receive her burns."

Under this posture of the proofs, if the jury believed, as it apparently did, plaintiffs' version of the accident, it was justified in concluding—and the trial judge properly so indicated—that the physical facts ran counter to the proofs adduced for appellant, and to the insistence of some of appellant's experts who were of the opinion that the burns were not sustained as the result of the closing of the circuit breaker.

Because of this breakdown in appellant's proofs, because God-frey was not at his post, because appellant did not promptly employ its available alternative system, and because of all other conflicting proofs exhibited concerning the accident, the jury may well have concluded, on this charge of the complaint, apart from appellant's lack of knowledge of the actual cause of the trouble or abnormality on its lines, that appellant did not, in fact, stricty and promptly follow the approved or standard practices; that even if appellant did follow the standard or approved practices, in the number of times it re-closed the circuit breaker, that it did not act with that degree of care (reasonable foresight, prevision and anticipation), with that promptitude with which it was in duty bound, under the circumstances, to act; and that appellant's breach in either particular was the efficient and proximate cause of plaintiff's injuries and loss.

B. *As to the condition of the pole.* The pole was set up in 1923 when the present highway was a dirt road, pursuant to a permit issued by the State Highway Commission, on a line designated by the state highway engineer. Appellant does not question that it had knowledge of the condition of the pole; it made periodic examinations thereof. Appellant's contention is that the pole was suitable for its purposes. There were proofs from which the jury, if it so chose, could conclude that the outer surface of the pole was "doty or rotten" for the depth of about two inches; that the pole had been weakened to the extent of thirty-three and one-third per cent.

Here again appellant contends that there is no proof of a causal connection between the fracturing and splintering of the pole and the dislodgment of the wires.

That argument is rested upon the grounds that the strength of the pole was only weakened by decay (appellant's witnesses so testified) to the extent of ten to twelve per cent.; and that the pole still had a factor of one and three-quarters to two above the normal requirements. Finally, appellant argues, even if it be conceded that it was open to the jury to find that the strength of the pole had been weakened to the extent

of thirty-three and one-third per cent., there was no proof that the impact between the automobile and the pole would not have produced the same results had the pole been of full strength. Clearly, the unsoundness of this argument lies in the fact that the jury may have concluded—upon proper deducible inferences from the proved facts—that had the pole been of full strength it might well have withstood the impact which would then not have caused the base of the pole to move one and a half feet and thus make the hole for the sinking and grounding of the car.

Thus, here again, a jury question was present both as to whether appellant was negligent on this charge of the complaint and whether that negligence was the efficient and proximate cause of plaintiffs' injuries and loss.

The learned trial judge was right in refusing to nonsuit and to direct a verdict.

*Third: As to exceptions to the court's charge.* Appellant contends that the trial judge was inconsistent in leaving to the jury the question of what interval of time elapsed between the several closings of the circuit breaker, when he had previously charged that there could be no liability if the infant plaintiff sustained her burns before the circuit breaker opened. We see no merit to this complaint. For here again appellant ignores the right of the jury to find upon the proofs, as it apparently did find, that plaintiff's burns were sustained in between or after, and not before, the several closings and openings of the circuit breaker. Time as to the openings and closings of the circuit breaker was of prime importance; it was so treated by all parties. A theory of a suit so adopted and pursued, is binding on the parties here. *Cf. Lastowski* v. *Lawnicki,* 115 *N. J. L.* 230 (at *p.* 234, and cases therein cited) ; 179 *Atl. Rep.* 266. Standard or accepted practices, moreover, comprehend not only the *number of times* the circuit breaker should normally be closed but in addition thereto comprehend *when and at what point of time* circuit breakers must be closed. Thus, as the trial judge carefully pointed out, the mere fact that the circuit breaker was twice closed may not have been a departure from the standard

practice. But in light of the proofs here exhibited, the question still to be determined was whether appellant promptly performed the required duty of care. And the trial judge was careful to point out to the jury that it was for it to determine whether appellant, in the point of time, followed the standard practice; that is, whether appellant was negligent in the performance of the duty which it owed to plaintiffs and whether that negligence was the proximate and efficient cause of the injuries sustained by the plaintiffs. The instruction, moreover, that the jury could not find appellant negligent upon the mere isolated circumstance that it twice closed the circuit breaker, even if it, as is claimed, narrowed the issue, was, if anything, more to appellant's benefit than to its detriment.

A careful study of the entire charge satisfies us the jury was made thoroughly to understand the necessity of plaintiffs' proving a causal relationship between the negligence, if any, of appellant in this particular and the injuries sustained by the plaintiffs.

*Fourth:* Appellant claims error because the trial judge, in addition to charging that it was under no duty to anticipate that the pole would be struck as a result of negligence, said: "I am not willing, however, to instruct you that by placing a pole within two feet of the paved shoulder of the highway such a company is not to anticipate the likelihood of an automobile colliding with it." We think that the charge was correct. The pole was not placed at the spot pursuant to legislative authority. *Sammak* v. *Lehigh Valley Railroad Co.,* 112 *N. J. L.* 540; 172 *Atl. Rep.* 60. No permit of the State Highway Commission can authorize the construction and maintenance on the highway of a structure dangerous to ordinary travel. *Opdycke* v. *Public Service Railway Co.,* 78 *N. J. L.* 576; 76 *Atl. Rep.* 1032; *Hoyt* v. *Public Service Electric and Gas Co.,* 117 *N. J. L.* 106; 187 *Atl. Rep.* 43. It cannot be said that accidents of the character here involved are rare. Within the last few years several cases in which an automobile had come into contact with a pole carrying electric wires have been brought to our attention. The likelihood of such accidents is clearly within the realm of prudent circumspection, prevision and reasonable anticipation.

*Fifth:* We find no merit to the claim that the trial judge erred in permitting witnesses Clark and Lee to testify, as wood experts, as to the condition of the pole.

In fine, we desire to mark the fact that we have carefully examined all other objections to the charge and all other points argued and find them to be without merit.

Judgments affirmed, with costs.

HEHER, J. (Dissenting.) I concur in the view that there was evidence tending to show negligence in the conduct of defendant. This occurrence was plainly within the realm of reasonable prevision. Certainly, that was so of the collision between the automobile and the pole carrying the high voltage transmission lines; and, such being the case, it was a question for the determinators of the facts whether the extension of the lightning rod—a conductor of electricity—down the road side of the pole, where contact with the colliding vehicle was probable if not inevitable, constituted the exercise of due care in the handling of this highly dangerous instrumentality.

But neither the trial theory nor the instructions of the learned trial judge took into account the lightning rod as a material factor in the appraisement of defendant's conduct. The jury were instructed, and in this I think there was prejudicial error, that the determinative was the time intervening between the closings of the circuit breaker, and the consequent re-energizing of the wires, after it had automatically opened due to the line fault ensuing from the collision—with promptness as the standard of care. The trial judge charged that the proofs conclusively established that it was the "generally adopted practice of the companies to close the circuit breaker at least twice before opening the circuit and killing the wires indefinitely," and therefore the jury were "not justified in concluding that the defendant was negligent merely because the circuit breaker was twice closed." He continued: "I am submitting to you at this trial for determination not whether the defendant company was negligent in twice closing its circuit breaker, but I am submitting to you for determination the intervals of time between the manual closing of the cir-

cuit breaker after it had automatically opened. The accepted practice of such companies in this particular has also been stated. There is some evidence from which it might be inferred that the closing of the circuit breaker in the present case was not in accordance with the accepted practice in respect to the interval of time between the first opening and its first closing, or its second opening and second closing. Therefore, how much time elapsed, either between the first opening of the circuit breaker and its first closing, or between the second opening of the circuit breaker and its second closing?" As regards the intervening time, he stated the point to be, "was the manual operation of the circuit breaker in accordance with accepted practice? * * * The basic question is, was the defendant, in the light of all the known conditions and circumstances, negligent in the manner in which it controlled its current, by the manual operation of the circuit breaker at the intervals of time at which you ultimately determined the circuit breaker was manually operated?" Then followed the instruction that delay of "several minutes" in effecting the reclosure of the circuit breaker, if it were found to be the fact, would furnish a substantial basis for an inference of negligence.

Thus there was injected into the case in the final stage, to the substantial prejudice of appellant, an issue not raised by the pleadings or introduced by consent during the presentation of the evidence. And, considered in the light of the proofs adduced, the test thus laid down was illusory. There was an utter lack of basis in the evidence for a finding that the time factor was in any sense a contributing cause of the infant respondent's injuries. Departure from the standard practice in this respect—and I find little of substance in the proofs as to what the practice was—was not the proximate cause of her hurts. The vehicle, jammed as it was against the lightning rod, served as a conductor of the electric current; and the time intervening between the openings and closings of the circuit breaker played no part, so far as the evidence discloses, in the infliction of the burns suffered by the infant passenger. Compare *Migliaccio* v. *Public Service Rail-*

*way Co.,* 101 *N. J. L.* 496; *affirmed,* 102 *Id.* 442. Concededly, the current was automatically cut off by the opening of the circuit breaker; the closings re-energized the lines. It follows that the judgment cannot be sustained on the theory thus propounded. It suffices to add that the propriety of the particular instruction was raised by an appropriate exception.

For these reasons, I vote to reverse. In this view, it is unnecessary to consider the other questions raised and argued.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, PARKER, CASE, BODINE, DONGES, PERSKIE, HETFIELD, DEAR, WELLS, WOLFSKEIL, RAFFERTY, WALKER, JJ. 13.

*For reversal*—HEHER, J. 1.