This is a suit in which the plaintiff, Mrs. Rebecca Guinn Short, widow of Lorenzo D. Short, seeks to recover damages for the accidental death of her said husband allegedly resulting from negligence of the defendant Electric Company.
This suit was consolidated, for purposes of trial and appeal, with the suit of Melder v. Central Louisiana Electric Co., La. App., 36 So.2d 671, in which the named plaintiff seeks recovery of damages suffered as the result of the same accident which caused the death of Lorenzo D. Short.
After trial by the District Court there was judgment in favor of plaintiff, Rebecca G. Short, in the sum of $15,000, and in favor of the plaintiff, Elmer V. Melder, in the sum of $3,516, from which judgments defendant has appealed.
For some twenty-three years prior to the accident plaintiff and her husband had lived on a small farm located on what is known as the Butter-Cemetery Road, about one mile south and slightly north of the corporate limits of the town of Forest Hills, an incorporated municipality of between two thousand and twenty-five hundred inhabitants, located in Rapides Parish.
The Central Louisiana Electric Company, Inc., defendant herein, is engaged in the business of the production, distribution and *Page 660 
sale of electric power in an area comprising several central Louisiana parishes. The electric current originates in Bunkie, Louisiana, and is transmitted by means of high power lines to LeCompte and thence to the Forest Hills area with which we are here directly concerned. The district office of the defendant Electric Company, under the management of one L.S. Landrum, is located at LeCompte.
Inasmuch as the location of roads and power lines in the immediate vicinity of Forest Hills is essential to a clear understanding of the situation, it is necessary that we go into some detail in describing the locus.
The Missouri-Pacific railroad line and the main paved highway between Alexandria and Lake Charles run almost due north and south through the town of Forest Hills, bearing a little bit to the west at a point a short distance south of the corporate limits. From the center of the town the highway known as the Melder Gravel Road angles off in a northwesterly direction. Another road crosses the railroad and highway and proceeds a short distance east before turning toward the north in the direction of LeCompte. At a point about 100 yards south of the Forest Hills schools the Butter-Cemetery road, which runs slightly east of south, intersects with another road known as the Longleaf Road, which leads off in a southwesterly direction.
Defendant's transmission line carrying some 34,500 volts of electricity leads into this vicinity from LeCompte, paralleling the LeCompte-Forest Hills road to a point some mile and a half or two miles northeast of Forest Hills, where it turns at right angles across the said road and proceeds to the Camp Claiborne and Boomtown area. At a point just west of the main Alexandria-Lake Charles highway, after the current has been stepped down to 2,300 volts by means of a transformer, the Forest Hills distribution line proceeds a short distance south, parallel with the highway, then turns west until it crosses the Melder highway, from whence it leads southeast into the town of Forest Hills, turns to cross the highway and railroad, and then turns again due south to a point at the intersection of the Longleaf and Butter-Cemetery Roads, where the 2,300 volt line angles southeast across the country through and beyond the Short property. The lateral line from the junction of the Longleaf and Butter-Cemetery roads, serves three or four customers and is known as the Short Lateral Line.
The service line of the Forest Hills Telephone Company, originating at the telephone building in or about the center of the town, follows the Longleaf road south to a point a very short distance past the junction with the Butter-Cemetery road where it turns at right angles to the east, running under the 2,300 volt transmission line of the defendant Electric Company, and thence turns at a point just west of the Butter-Cemetery road to follow the road out to and then beyond the Short premises.
The electricity is transmitted by means of an alternating current which, as best we appreciate the matter, consists of a double wire system which carries the current out on a "hot" or energized wire and back on a neutral wire in the locality which we have roughly outlined.
On the night of April 10, 1947, the country in and about Forest Hills was struck by a wind and rain storm of considerable violence. The storm is shown to have affected an area some several miles in extent, which included a number of the localities we have mentioned, namely, Boomtown, LeCompte, Forest Hills and Longleaf. As a result of this storm the service to defendant's customers was seriously impaired. It is shown that the current in Forest Hills and vicinity went out sometime around the hour of midnight, and on the morning of April 11th, according to the testimony of defendant's manager, L.S. Landrum, numerous complaints of outages were received at the district office in LeCompte. As a result of these complaints Mr. Landrum began dispatching a light repair crew in charge of his brother, D.C. Landrum, who was accompanied by one other repair man, to known trouble spots for the purpose of making emergency repairs. Finding that this small repair crew was unable to handle the numerous breaks of service and transmission lines, Mr. Landrum called for the assistance of a crew working out of the Pineville District *Page 661 
Office and this crew, consisting of five men in charge of one Haines, was dispatched from Pineville to Forest Hills during the morning of April 11th.
As a result of the violence of the storm, a number of trees on the Short farm were blown down, one in particular being blown across the Butter-Cemetery road at a point only some hundred feet or so north of the barn on the Short property. This tree is shown to have fallen across the telephone wire, which wire was entangled in its branches and carried to the ground. At the point where the telephone lines crossed under the transmission line of the defendant Electric Company, just south of the junction of the Longleaf and Butter-Cemetery roads, it is shown that the uninsulated power line, by reason of breaking or being burned in two, had fallen across the telephone line.
At a point just north of the 34,500 volt Camp Claiborne transmission line there is located a sub-station of the defendant Electric Company, and between the sub-station and the said line there was installed and in operation at the time a circuit breaker or automatic cut-off of General Electric manufacture. It is disclosed by the record that at some time during the night of the storm, by reason of one or more of the breakages in defendant's transmission lines, the circuit breaker went into operation and automatically cut off the current, thus de-energizing the transmission lines into Forest Hills and leaving all of the immediate area without electric current.
Sometime about 8:00 or 9:00 o'clock on the morning of April 11th the Landrum repair crew, in response to complaints of trouble and interruption of service, proceeded from LeCompte to the Forest Hills' area, making some repairs on route, and upon finding the circuit breaker cut out proceeded to attempt to ascertain the source of trouble in this section. As a result of the investigation a complete break was found in the 2,300 volt transmission line on the Melder road, which led into and beyond Forest Hills. Mr. Landrum and his helper, not having the necessary equipment to make repair of the break, proceeded to install what is know as a "hot line clamp" at a point north of the break, which emergency repair served to restore service to the Boomtown-Camp Claiborne area, while at the same time maintaining the dead or de-energized condition of the transmission lines into Forest Hills and the vicinity south thereof. It is shown that the Landrum crew, after effecting this emergency repair, proceeded into the town of Forest Hills, made some few minor repairs and about 11:00 o'clock contacted the heavy repair crew in charge of Mr. Haines, informed him of the break on the Melder highway, and then left the vicinity in order to begin effecting repairs at other points in the district. The Haines crew made repairs of the Melder line break, returned to Forest Hills for lunch, and at or about the hour of 1:50 P.M. Haines called Mr. L.S. Landrum, the manager of the LeCompte district, to report that he had effected the repairs and to request further instructions, after which he and his crew left the vicinity of Forest Hills.
Also on the morning of April 11th, Mr. Croaker Melder, unit highway foreman in Ward Four of Rapides Parish, in the employ of the Police Jury of said Parish, accompanied by his brother, Elmer V. Melder, started out to inspect the storm damage with respect to its effect upon the blockading or impending the use of the roads and highways in his unit. After eating lunch in Glenmora, the Melder brothers were advised that the Butter-Cemetery-Forest Hills road was blocked and they proceeded to this vicinity. At the Short farm the Melders met Mr. and Mrs. Short near the barn, and, after some conversation, the Melders, accompanied by Short, began to walk up the Butter-Cemetery road. As the party came to a cattle-gap leading from the lot to the road, Mr. Elmer Melder observed a telephone wire lying across the cattle-gap and out in the road. He picked the wire up and laid it over a post by the side of the cattle gap and in the course of this operation he received no injury nor was anything out of the ordinary noted with respect to the condition of the telephone wire. It must be borne in mind that these events which we now relate are established as having taken place during a period of time roughly fixed as being between 1:00 o'clock and 2:30 o'clock, P.M. Due to the operation *Page 662 
of the circuit breaker on defendant's line and the consequent de-energizing of the electric transmission lines, there was no danger apparent, nor, indeed, was there any actual danger in the performance of the simple operation of lifting a telephone wire and removing it from the road.
But at this point the hand of fate intervened. At some time immediately after the incident related the Haines repair crew had closed the circuit breaker, energizing the transmission lines to Forest Hills and beyond, including the Short Lateral Line, and after observing evidences of the restoration of service in and about Forest Hills, without further investigation or the attempt to locate additional breaks, departed from the locality.
The ill-fated party of three proceeded from the cattle-gap along the Butter-Cemetery road for a distance of 100 feet or so where they came to a tree which had blown down across the road. Although there is no direct evidence on the point, the physical facts and circumstances lead to the inescapable conclusion that Mr. Short had at some time during the morning been working on this tree in the effort to remove it from the road. Upon arriving at this point the members of the party noticed that the telephone wire had been caught in the branches of the tree. Mr. Elmer Melder again picked up the telephone wire, but, on this occasion, the simple operation was fraught with extreme danger for the wire was charged with a current of some 1150 volts of electricity and this dangerous and powerful element, perceptible only to the sense of touch, struck with all its force the hands of the innocent mortal who unwittingly had challenged its hazard. The force of the shock threw Melder backward to the ground. Without stopping to think or to weigh the danger, actuated only by the laudable desire to rescue his fellowman, Lorenzo D. Short snatched a double-bitted axe from the hands of Mr. Croaker Melder and struck at the telephone wire in the effort to pull it away from the body of Elmer Melder. The storm had left the ground muddy and wet. Unquestionably the soles of Short's shoes were wet, and the handle of the axe, of green hickory, served as a conductor of the electrical current which now struck down Short, pulling him to the ground where he lay with his forearms and chest across the wire and the axe, the ill-starred instrument of his attempted rescue, pinned beneath his body.
Croaker Melder, seizing a stick, proceeded to knock the wire out of his brother's hands, pulled him to a position of safety and reached out to touch the body of Short with the idea of attempting to pull him away. Receiving a severe shock Croaker Melder realized that he could not disengage Short from the power line and thereupon he carried the body of his brother to his truck, called to Mrs. Short, advising her of the accident, and proceeded to take his brother, who was in an unconscious condition, to the hospital, stopping en route once or twice to inform neighbors and to solicit them to go to the aid of the unfortunate Short.
Mrs. Short immediately started, in her car, for Forest Hills, where she arrived at the office of the telephone company sometime between 2:00 and 2:30 P.M., having stopped briefly at least once along the way to tell some friends about the accident. At the telephone office the operator, Mrs. Riley, immediately placed a call for the district office of the electric company at LeCompte and informed Mr. Landrum of the accident. Landrum dispatched a repair crew to the scene within a very short while. The crew promptly located the source of the trouble at the junction pole where the power line of the Short Lateral had fallen across the telephone wire and speedily deenergized the line.
Meanwhile, friends and neighbors of the Shorts, apprised of the accident by Croaker Melder and Mrs. Short, had rushed to the scene. One of the men present procured an axe from the nearby barnyard, severed the charged wire on either side of Short, and his body was removed to a safe distance. Attempts at resuscitation by means of artificial respiration and the use of a pulmotor failed and Short was pronounced dead by two doctors, one of them being the acting Parish Coroner, who had been summoned to the scene.
Plaintiff's claims for recovery of damages are based upon the proposition that *Page 663 
the death of her husband resulted from the negligence of the defendant Electric Company by reason of its failure and neglect to make a proper and thorough inspection of the storm-damaged area in and about Forest Hills before re-energizing the transmission lines in the said area. Defendant denies any negligence in this connection and further urges the plea of contributory negligence on the part of the deceased, Short, which plea is predicated upon the proposition that Short, who is shown to have been experienced, at least to some degree, as an electrician, was grossly careless and negligent in striking the wire with an axe, which was fitted with a green handle, under conditions which Short knew, or should have known, made the operation extremely dangerous, and that, under such circumstances, Short carelessly and recklessly jeopardized his own life, and such negligent act was the proximate cause of his death.
It is first necessary for us to undertake a resolution of the charge of negligence brought against the defendant Electric Company. In aid of our consideration of this point we summarize the pertinent facts, in connection with the charge of negligence, which facts we hold to be conclusively established by a preponderance of the evidence and which, in our opinion, have a material bearing upon the issue before us.
[1] It is established that the wind and rain storm of April 10th did considerable damage in the area served by defendant's transmission and service lines, including Forest Hills and the immediate vicinity; that early on the morning of April 11th the District Manager of the defendant company at its district office in LeCompte was apprised of extensive damage to the company's lines, resulting in outages and discontinuance of service to its customers; that the district manager did not list the calls received either by location or by names of the callers, but that he dispatched service crews to such locations as appeared to be in need of attention. In this connection it is essential that we call attention to the fact that Landrum, the district manager of the defendant Electric Company, denied having received any report of trouble on the Short Lateral Line, but it is established by the uncontradicted testimony of a witness for plaintiff that such a report was made by one of the customers who was served by this line. Inasmuch as Landrum admitted in his testimony, as we have pointed out above, that he did not keep any list of the calls which were received and could not name the individuals who called to report trouble, perforce we must give complete credence to the positive and affirmative testimony of plaintiff's witness.
It is further established by a number of witnesses for both plaintiff and defendant that the break in defendant's transmission line at the junction, or lead-off point of the Short Lateral line, was readily observable from the road and was a matter which even a casual and cursory inspection would have immediately revealed. It is also established that the repair crews which were working in the Forest Hills area for a period of some hours on April 11th, and which consisted during this period of not less than two nor more than seven men, were not only engaged in repairing breaks in lines with respect to which they had received definite information, but in the course of their work, on their own initiative, made repairs wherever they found a source of trouble.
It also appears that the crew in charge of defendant's employee, Haines, after repairing the Melder break and closing the automatic circuit breaker, made observations to determine whether service had been restored, and further, according to their testimony, it is plain that they relied upon the operation of the automatic circuit breaker, believing that any other trouble would be evidenced by a kicking out of this safety device. Unquestionably, this fact would have some persuasive effect upon the issue at hand were it not for the fact that defendant's witnesses testified that, to the knowledge of the employees of the defendant company engaged in this nature of work, a circuit breaker of the type used was not by any means infallible and could not be safely relied upon to disclose trouble resulting from breaks in transmission lines by its automatic operation. *Page 664 
[2] Upon the basis of the facts recited we proceed to a consideration of the law which is applicable. First, it is necessary that we evaluate the degree of care required of the defendant company as bearing upon the issue of negligence. As is usually true, neither of the extreme requirements with regard to the degree of care required is applicable to the present case. To say that the defendant is required to exercise only reasonable care would be in effect to neglect the highly dangerous potentialities of the commodity in which it deals. On the other hand, to consider the defendant as the insurer of the public generally against injuries resulting from the ordinary course and conduct of its business would be to impose an impracticable and disproportionately burdensome obligation. We subscribe to what we consider a moderate and fair view as enunciated in 18 American Jurisprudence, Section 48, page 443:
"The degree of care required to be used in the production, distribution and use of electricity, a force concerning which about the only thing certainly known is its highly dangerous character, is stated in various terms which, perhaps, convey merely one idea. To declare that the utmost care must be used to prevent injury sounds different in statement than to say that ordinary care must be used in view of all the circumstances; but when analyzed, the meaning is not far different, for the ordinary care required under the circumstances is relatively a high degree of care when put into practice."
One cannot escape the importance of the practical proposition that those who engage in the production and transmission of electric current and power are dealing with an element which, when properly harnessed and firmly controlled, proves a meek, efficient and valued servant to the welfare and progress of mankind. But, once loosed from its bounds, this otherwise subservient agency may prove a veritable monster of destruction, wreaking its blind fury upon innocent, unsuspecting and unwarned victims.
We have examined with great care and sincere interest all authorities cited by learned counsel for both plaintiff and defendant, and, because of the importance of the issues tendered herein, we propose to analyze the holdings of such of the cited cases as we feel to be applicable.
In Hebert v. Lake Charles Ice, Light Waterworks Co., Ltd.,111 La. 522, 35 So. 731, 734, 64 L.R.A. 101, 100 Am.St.Rep. 505, we find an expression which we deem to be particularly appropriate to the case before us, as follows:
"Defendant seeks to avoid the consequence of its fault by urging that the immediate, direct, and proximate cause of Hebert's death was a most unusually violent storm, which it had no reason to anticipate, which threw down a wire of the telephone company."
The exact contention is made in the instant case and it is submitted in behalf of defendant that a requirement to the end that defendant company should have made an inspection of sparsely populated areas in the Forest Hills district would be grossly unreasonable in view of the great number of emergency calls from other localities which required immediate attention. This argument loses much of its weight and entirely fails to make any serious impression upon our minds by reason of the fact that the record is devoid of a showing of any facts which would lead to the conclusion that repair services of a more emergent nature were actually required at other points of the transmission system operated by defendant.
Similarly, the point that the section south of Forest Hills was sparsely populated and therefore was not a potential danger of great hazard to any large number of people, fails to carry any great weight in view of the fact that the need for service to more heavily populated areas has not been established as a part of the record before us. There are other facts which detract from the force of this argument, namely, that the dangerous break in defendant's line was located at a point immediately adjacent to a public road, a very short distance removed from the grammar and high schools of the community, and was in an area which, to the knowledge of the defendant, had been visited by a violent storm, an incident which in all reason should have indicated the absolute and *Page 665 
pressing need for the exercise of extraordinary care and diligence on the part of defendant in investigating every reasonably possible source of danger within the immediate vicinity.
[3] What we regard as an appropriate statement of degree of care, relative to the facts herein presented, is found in Younse v. Southern Advance Bag Paper Co., La. App., 159 So. 611, 616:
"The very highest degree of care practicable to avoid injury to everyone is required of those who make use of such a dangerous agency (i. e. electric current) in their business. This is due to the fact that electricity gives no warning or knowledge of its deadly presence. Vision cannot detect it as it is without color, body, is odorless and without sound, and the only way to discover it is by feeling, communicated through touch * * * which, as soon as done, makes the one who touches it its victim."
In Ledet v. Lockport Light Power Co., 15 La. App. 426, 132 So. 272, 275, the court for the First Circuit stated its appreciation of the principle of degree of care in the following words:
"The courts of this state recognize as the duty of electric companies maintaining high-powered wires in communities where contact may be had with the people engaged in the pursuit of business or pleasure in a legitimate way and in a place where they have a right to be, that of the utmost care consistent with the practical operation of their plant."
In the above case the court brought the facts under the principle set forth in the provisions of Article 2317 of the Civil Code, which fixes responsibility for "the things which we have in our custody."
Expressions found in the opinion of Judge Taliaferro of this Court in Scott v. Claiborne Electric Cooperative, Inc.,13 So.2d 524, have been cited by counsel for both plaintiff and defendant, the former relying upon the expressions bearing upon degree of care, and the latter differentiating the applicability of the principles of care on the variance in facts. It is true that the facts of the two cases are entirely different, but, nonetheless, we are firmly of the belief that the same principles with respect to the degree of care required are apropos.
In Dunagan v. Appalachian Power Co., 4 Cir., 33 F.2d 876, 879, 68 A.L.R. 1393, we find the following expression by the Court:
"It is true that the test of due care is not custom or usage, but what reasonable prudence would require under the circumstances; * * *."
We are impressed with the recital of facts involved in the case of Southern Utilities Co. v. Murdock, 99 Fla. 1086,128 So. 430, 432, decided by the Supreme Court of Florida. The plaintiff sustained severe injuries as the result of coming in contact with the high voltage electric wire of the utilities company while walking across his own yard. In that case, as in this, the defendant utilities company, urged, among other defenses, that the fallen wire was the result of an act of God proceeding from the effects of a severe windstorm. In the course of its opinion the Court made the following statement:
"The injury occurred early during the morning of December 1st. If the high wind and stormy conditions prevailed during the night previous, reasonable prudence and foresight required extraordinary activities which, with the aid of modern mechanical devices in the power house of the defendant, would have enabled it immediately to detect a leaking wire in contact with the ground in some reasonably definite locality. This phase of the subject was very clearly put by Mr. Justice Buford in the case of Davis v. Ivey, 93 Fla. 387, 112 So. 264."
To the same effect as the above quoted expression under similar circumstances the Supreme Court of Wisconsin in Hayden v. Carey, 182 Wis. 530, 196 N.W. 218, 220, held:
"Where wires become disarranged as the result of an unusual storm, it is the duty of the owner of an electric light plant to make immediate repairs, and after a storm of any considerable vigor, although it is not of extraordinary violence, an owner is bound to anticipate that its system may be *Page 666 
out of order, and it is incumbent upon him to make an immediate inspection thereof as soon as practicable. Curtis on Law of Electricity, § 476.
"Where an electric telephone wire had been burned in the evening preceding the accident, causing the ends of the wire to be suspended from the poles, and where a person came in contact with it the following morning, it was held that the company was negligent in not making an inspection during the night. Brown v. Consolidated L. P. I. Co., 137 Mo. App. 718, 109 S.W. 1032.
"The doctrines and rules thus laid down by the text-books and authorities above referred to seem to be well fortified and established by the decisions in this country, and have a tendency to protect human life and limb.
"There is also evidence in the case that it is customary for electric companies after a violent storm to make immediate inspection of their lines. The evidence also shows that it would be feasible and practicable for the company to make proper inquiries by the use of the telephone, in order to ascertain whether its line is in proper order. While the storm raged during the greater portion of the time intervening between 11 o'clock A.M. and 4:30 o'clock P.M. on the day of the accident, nevertheless there was a period of 1 1/2 hours where it substantially subsided. The telephone is a modern convenience, and would have been a great aid in ascertaining breakages in the system and interruptions in transmission. None of the means available were resorted to. At 4 o'clock p.m. a telephone message was received by the defendant from a station known as Powers Lake, a line connected with the Wilmot-Salem line, but nothing was done to shut off the current until after the accident in the instant case had happened."
In Kidd v. Kansas City Light Power Co., Mo. App., 239 S.W. 584, the Court held the defendant liable on the ground, among others, of negligence by virtue of its failure to render a situation resulting from a broken wire "perfectly safe."
The case of Ohio Power Co. v. Fittro, 36 Ohio App. 186,173 N.E. 33, involved the correction of a dangerous condition of electric transmission lines by reason of an automobile accident. One person was electrocuted by coming in contact with the wires, and, upon being notified the electric company shut off the power. Subsequently, being advised that the line had been cleared by the removal of the body and of the automobile, the lines were re-energized with the result that a short time later a person who visited the scene was electrocuted. The Court held, in effect, that the electric company was negligent in re-energizing the line in the absence of investigation and inspection of the scene of the accident.
To the same effect, under somewhat similar facts, was the holding of the Court of Errors and Appeals of New Jersey in Adams et al. v. Atlantic City Electric Co., 120 N.J.L. 357,199 A. 27, 726.
In Foley v. Northern California Power Co., 14 Cal.App. 401,112 P. 467, 469, the Court of Appeal for the Third District of California declared:
"The owner or operator of an electric plant is bound to exercise reasonable care in maintaining a system of inspection by which any change in the physical condition of any part of the plant, which would tend to increase the danger to persons lawfully in the pursuit of business or pleasure, may be reasonably discovered."
As opposed to the principles enunciated in the above cited cases the defendant points to certain other authorities in support of its position, among which we note the following:
Scott v. Claiborne Electric Cooperative, Inc., supra [13 So.2d 529], quoting as follows:
"* * * the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its plant to prevent such injury; * * * The law is complied with when the company provides such a protection as will safely guard against any contingency that is reasonably to be anticipated. The company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated." *Page 667 
From Potts v. Shreveport Belt Railway Co., 110 La. 1, 34 So. 103, 105, 98 Am.St. Rep. 452, the following statement of the rule of care is quoted:
"A company maintaining electrical wires over which a high voltage of electricity is conveyed, rendering them highly dangerous to others, is under the duty of using the necessary care and prudence at places where others may have the right to go either for work or pleasure, to prevent injury."
Counsel for defendant in brief cites a note from 18 American Jurisprudence, Section 54, page 449, as follows:
"It has been declared that in order to hold a company liable for injuries inflicted by its high voltage wires blown down at night in a storm and brought into contact with telephone wires, it should be shown that the poles were rotten, or the installation otherwise defective, or that the company was guilty of laches in the matter of finding out that the wires were down or in the matter of shutting off the electricity after obtaining that information."
The above note purports to be the summation of a holding in Borell v. Cumberland Telegraph Telephone Co., 133 La. 630, 63 So. 247, L.R.A.1916D, 1064. In our examination of the cited case we find the above worded statement set forth in the syllabus of the case. However, careful and repeated reading of the entire opinion of the Court, both on original and rehearing, fails to disclose even the remotest connection between such opinion and the principle set forth in the syllabus. The case turned on the question of proximate cause of injury to a lineman who had been definitely and specifically instructed to limit his activities to locating certain line trouble. In violation of these instructions the lineman negligently placed himself in contact with a hot wire and the court found that the negligence of the injured party was the sole and proximate cause of the injury.
With respect to the degree of care distinguished counsel for defendant makes the following observation in brief:
"As was stated in the case of Mayer v. Central Light Power Co., 1927 [55 N.D. 805], 215 N.W. 287, 288, the degree of care to be exercised will depend upon numerous factors, such as the location of the lines — whether they are located in thickly or sparsely settled communities, the use to which they are put, their remoteness or proximity to travelers on the highway, the relative harmless or dangerous character of the current to be transmitted, and other particular circumstances."
Our examination of the above cited case does not bear out the conclusions which have apparently been drawn by learned counsel to the effect above stated. We find no mention in the cited case, except such inferences as may be drawn from the Court's statement of facts, to any of the factors mentioned as having a bearing upon liability of the defendant power company. On the contrary we are impressed by the court's expression of the governing principle of law under which it allowed recovery against the defendant power company, which was set forth in its opinion as follows:
"It is elementary that the distribution of electrical current of high voltage places upon those responsible for its handling the duty of exercising care to safeguard it; and, where transformers or wires carrying such current are so placed that persons are likely to come in contact therewith, the duty of safeguarding requires greater precaution against injury than would be required if the instrumentalities were located at a more isolated point."
Under the facts which we have found in the case before us certainly the applicability of the above stated principle would be particularly appropriate considering that the break in defendant's transmission line was at a point in close proximity to a public road over which, in all reason, people might be expected to be freely passing.
Careful examination of the cases of Calhoun v. Nantahala Power Light Co., 1939, 216 N.C. 256, 4 S.E.2d 858; West Texas Utilities Co. v. Dunlap, Tex.Civ. App., 1944, 175 S.W.2d 749; Dixon v. Kentucky Utilities Co., 1943, 295 Ky. 32,174 S.W.2d 19, 155 A.L.R. 150; and Jackson v. Utica; Light Power Co., 1944, 64 Cal.App.2d 885; 149 P.2d 748, 749, 750, cited by counsel for defendant, fails to disclose *Page 668 
any holding of law or any statement of facts which vary the well-established and accepted principles of jurisprudence bearing upon the issues presented. The above cases were cited by counsel in support of the principle that light and power companies are not to be regarded as insurers nor are they under legal obligation to safeguard their operations against occurrences which cannot be reasonably expected nor contemplated. We freely concede the correctness of the first position and with certain reservations the justice of the second. However, we do not find that there is any need for the application of the extreme and untenable theory of the relationship of an insurer, nor, under the facts which we have found in this case, is there any applicability of the doctrine which protects light and power companies against unexpected and unforeseen accidents. The cases cited involved facts — injury to a person cutting tree branches which came in contact with high voltage transmission lines and under which facts the court held for the plaintiff — injury to a workman engaged in erecting a building beneath high voltage power lines, which construction work was unknown to defendant power company — injury resulting by reason of damage caused by breaking of a pole as the result of being struck by an automobile — and injury to the operator of a power shovel which came in contact with a telephone wire strung upon poles with high voltage power lines.
[4] In the last quoted case (Jackson v. Utica Light Power Co.) the appellate court affirmed a judgment in favor of the surviving wife and child of the decedent in the amount of $20,000, and in the course of its opinion the court quoted from an earlier case the following definition of actionable negligence:
"In order to constitute actionable negligence, it is necessary that the following three elements be presented; (1) The legal duty to use due care; (2) a breach of that legal duty; and (3) that such breach is the proximate or legal cause of the resulting injury."
We are wholeheartedly in accord with the principle and effect of the above quoted pronouncement.
[5] We thoroughly subscribe to the principle stated in extracts quoted by counsel for defendant from the opinion of Judge Taliaferro in Bynum v. City of Monroe, La. App., 171 So. 116, 118, as follows:
"Diligence must be exercised to discover any breaks or defects in the wires. The company must make reasonable and proper inspection of its appliances, or, as is asserted by some authorities, must exercise the highest degree of care in such inspection. This duty does not contemplate such inspection as would absolutely forestall injuries. The exercise of due care requires such reasonable and thorough inspection as will preserve insulation from impairment or detect defects when occurring. The reasonableness of the inspection depends not only on the condition of the line, but also on the nature of the danger to be feared. * * *
"The liability of an electric company for injuries turns upon whether the company knew of the defect causing the injury or by the exercise of reasonable diligence should have known it."
[6] After careful and searching study and consideration we are confirmed in our conclusion that, under the facts of the instant case, the defendant is guilty of actionable negligence.
[7] Where a company engaged in the production, transmission and sale of electric energy has knowledge of the occurrence of a storm of some violence and additional knowledge of the breaking of lines and the interruption of service, it is negligent if it fails to use extraordinary care, particularly with respect to investigation and inspection of lines in a particular area where damage has been reported.
[8] Where the preponderance of the evidence shows that a company dealing in the production and transmission of electric energy has been notified of trouble on a particular section of its transmission system, it is no defense against an action for damages that the section in question was located in a sparsely settled area, nor that the line served a very few consumers. Death is no less final by reason if its occurrence in a sparsely settled area than if *Page 669 
it had occurred in the very heart of a crowded metropolis.
Particularly is this rule applicable in an instance where a defendant power or light company has failed to show that its neglect was due to the pressing and immediate need for attention to other emergencies ostensibly more dangerous in nature than the one neglected.
Under the facts and circumstances which have been conclusively developed in the case before us, we think the principles subscribed by the vast weight and preponderance of jurisprudence of this and other states effectively sustain the finding that the defendant was guilty of negligence.
[9] We are further of the opinion that failure by the agents and employees of the defendant company to carefully note every trouble call and complaint received in a particular area, which had been affected by a violent rain and windstorm during the preceding night, constitutes an obvious element of negligence and a complete lack of even a minimum degree of care.
This negligence is accentuated and rendered the more inexcusable by reason of the fact that the defendant Electric Company had repair crews working in the immediate area for a number of hours on the morning of April 11th. It is shown that the repair crews found some damage with respect to which they had been given no reports, which damage they repaired, as we have above noted, on their own initiative. Certainly it follows that they could easily, at the expense of a little time and effort, have inspected the transmission and service lines in and about Forest Hills. The breaks which had been located by the repair crews, insofar as is reflected by the record, were all observable from the public roads and highways in the area. According to our finding of facts, the same condition was true of the break in the Short Lateral which was responsible for the death of Short and the serious injury to Melder.
It is clearly shown that no specific instructions were given the repair crews who were dispatched to the Forest Hills area except to locate and repair breaks in service. The possible effects of the storm and the reports of disruption of service in the affected section were sufficient in themselves to indicate the need for a closer inspection and investigation than was made by defendant's repair crews. The testimony shows that both of the crews left Forest Hills after reporting that they had completed repairs without taking the precaution of making any inspections, although defendant's witness, Haines, testified that he took his crew into the Forest Hills community on the morning of April 11th because his company had been advised that storm damage had occurred, and that he and his crew went there for the express purpose of repairing the storm damage to the company's lines.
[10] Failure of repair crews of a defendant power company to make even a reasonably careful and diligent inspection in the attempt to locate possible breaks of lines in a storm-damaged area before re-energizing transmission lines is obviously an additional factor of negligence.
[11] The reliance of the members of repair crews of a power company upon the efficacy of a safety device, in this instance an automatic cut-off or circuit breaker, which to the knowledge of such persons is subject to failure, is an empty and futile gesture which has no value nor weight in exonerating such company from liability.
[12] In view of our finding of negligence on the part of the defendant, we are not impressed with the plea that the proximate cause of the accident was the result of the severe windstorm of the night of April 10th, and the omission of Short to notify the company of grounding of the power line in his field.
Defendant, through its agents and employees, knew of the storm and had knowledge of numerous instances of damages caused thereby; and, in all reason, should have considered the probability of damage to their lines in the vicinity of the Short Lateral. Since, additionally, it is shown that notice of the trouble had been given by one of defendant's customers on the Short Lateral defendant's contentions in this respect are not of sufficient force to merit extensive consideration. In this connection we are impressed with the observation *Page 670 
of the Court in the opinion of the United States Circuit Court of Appeals for the Eighth Circuit, in Illinois Power Light Corporation v. Hurley, 49 F.2d 681, 689, as follows:
"It was not only the duty of the defendant to exercise proper care in the installation of its instrumentalities, but it was also its duty to exercise such care in the maintenance thereof as was proportionate to the danger in their use. This might require such inspection as would detect defects when occurring, and this duty was a continuing one."
Much more is the above principle applicable when the instrumentalities in use have been damaged to the knowledge of the operators in such degree as would indicate to any reasonable person the need for the exercise of unusual care and diligence in detecting and repairing damage.
[13] We proceed now to a study of the plea of contributory negligence advanced on behalf of defendant. As we have above noted, this plea is predicated upon the contention that Short, an experienced electrician, was grossly negligent in attempting to remove the charged wire from Melder's body while standing on wet ground and using an axe fitted with a wet, green handle. Admittedly, under ordinary circumstances, this defense might be entitled to favorable consideration. However, under the well-established and exceedingly liberal principles evolved under what is denominated as the "Law of Rescue", this plea must fail. The general doctrine is well stated in 38 American Jurisprudence, page 912, which doctrine has been adopted by the Courts of Louisiana, as is clearly evidenced by the holdings of the Supreme Court in Peyton v. Texas Pacific Railway Co., 41 La. Ann. 861, 6 So. 690, 17 Am. St.Rep. 430; Potts v. Shreveport Belt Railway Co., 110 La. 1, 34 So. 103, 98 Am.St. Rep. 452; and Whitworth v. Shreveport Belt Railway Co.,112 La. 363, 36 So. 414, 65 L.R.A. 129.
The facts in the Whitworth case, supra, are far stronger in support of the argument advanced by defendant then are the facts in the instant case. In the case referred to, Whitworth, an experienced telephone lineman, under the stress of great excitement in observing a companion who had received a tremendous and fatal shock from a wire, and despite warnings, himself grasped the same wire, and as a result came to his death. The Supreme Court in an elaborate opinion, in the course of which they discussed a number of pertinent cases both from Louisiana and other jurisdictions, exonerated Whitworth of a charge of contributory negligence.
While it is true that in the application of the rescue doctrine it must be shown that the rescuer did not rashly and wantonly endanger his own life, we do not think the facts in this case would justify any such conclusion. Short was confronted with an emergency which resulted from an incident that transpired within a split second of time. His reactions were instantaneous, almost reflex in nature. In such an instance one who stopped to weigh, precisely and meticulously, every element of danger, one who proved so cold as to be unmoved to immediate action by the spectacle of a friend caught in agony would never qualify for the accolade which men bestow, and for the reward which unquestionably God himself reserves for one who has proved his devotion to the ideal that "Greater love hath no man than this, that a man lay down his life for his friends."
To construe Short's response to the development of the immediate emergency as being an act of recklessness to a degree constituting contributory negligence would be to deny every humane impulse and would entail an utter disregard of those finer qualities which are inherent in the hearts and souls of mankind.
[14] Defendant further complains that plaintiff has failed to establish the fact that defendant's power line was broken before Haines energized the line after repairing the Melder break. This proposition is directed at the point that if the wire burned in two or broke after being re-energized, no amount of inspection or care on the part of defendant could have served to detect and remedy the effect of the break before the accident which resulted in injury to Melder and death to *Page 671 
Short. To hold in accordance with this contention would necessitate such a strained estimate of the most speculative possibilities as would require an absolute disregard of the well-established facts. Under the showing reflected by the record in this case, the only reasonable and justified conclusion is that the transmission wire was broken by reason of the effect of the storm on the night of April 10th.
[15] The only other point which requires our attention is with respect to the quantum of damages. Defendant questions plaintiff's testimony as to the earnings from the operation of Short's farm. Be this as it may, it must be noted that defendant failed to introduce any evidence which would tend to rebut plaintiff's testimony. The mere questioning of the accuracy of testimony in briefs on behalf of parties litigant is not sufficient to overcome the weight that must be accorded evidence adduced on trial.
[16, 17] However, quite aside from a consideration of this specific point, we find nothing which would indicate that the award of $15,000 to a widow who has been deprived of the companionship and love of her husband after a close and intimate association over a long period of years, and who has lost the support of her worthy mate which has been, so far as is shown, more than adequate for their needs during the entire period of their married life, and who, unable to continue the operation of the farm which has been her home and principal support for 23 years, is forced to rely upon a small wage dependent upon uncertain employment, and a small additional revenue derived from the rent of a room, is anything but excessive. Additionally, this Court in a number of instances has acknowledged the force of what has become a well settled rule that courts will take judicial cognizance of the diminishing value and purchasing power of the dollar in making awards of damages. Richey et al. v. Service Dry Cleaners, La. App., 28 So.2d 284; Jakubec v. Southern Bus Lines, La. App.,31 So.2d 282; Weadock v. Eagle Indemnity Co., La. App.,15 So.2d 132; Brown v. Homer-Doyline Bus Co., La. App., 23 So.2d 348; Scott v. Claiborne Electric Cooperative, Inc., La. App.,13 So.2d 524.
Under the circumstances of the instant case we find nothing which indicates that the allowance of $15,000 should be subject to reduction at the hands of this Court.
For the reasons assigned, the judgment appealed from is affirmed at appellant's cost.